MAURER v. DICKERSON et al.

(Circuit Court of Appeals, Third Circuit. February 5, 1902.)

No. 21, September Term, 1901.

1. PATENTS—CONSTRUCTION OF CLAIMS—CHEMICAL PRODUCT.
   A claim of a patent for a new chemical product, which is described with such clear marks of identification that it can readily be recognized aside from the process by which it is made, is not limited to the product of a particular process because such a process is described in the specification and is the only known process by which it can be produced.

2. SAME—VALIDITY AND INFRINGEMENT—PHENACETINE.
   The Hinsberg patent, No. 400,086, for the chemical product known commercially as "Phenacetine," largely used in medicine since its production by the patentee, construed, and held not anticipated, valid, and infringed.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

Hector T. Fenton, for appellant.

Livingston Gifford, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge. This is an appeal by the defendant below from a decree (108 Fed. 233) against him upon a bill for the infringement of letters patent No. 400,086, granted March 26, 1889, to the Farbenfabriken Vormals Fr. Bayer & Co., of Elberfeld, Germany, assignee of Oskar Hinsberg. The invention covered by this patent relates to a new pharmaceutical product, a new antipyretic and antineuralgic, known commercially as "Phenacetine," and chemically as "mono-acetyl-para-mido-phenetol." The specification contains a description of the new pharmaceutical product, and of the inventor's (Hinsberg's) process of production. The patent has a single claim, which is in the terms following:

"The product herein described, which has the following characteristics: It crystallizes in white leaves, melting at 135° centigrade; not coloring on

addition of acids or alkalies; is little soluble in cold water, more so in hot water; easy soluble in alcohol, ether, chloroform, or benzole; is without taste; and has the general composition $C_{10}H_{13}O_2N$."

In our consideration of the case we naturally first take up the 10th, 11th, 12th, 13th, 14th, and 15th assignments of error, all of which relate to the opening paragraph of the specification, which is as follows:

"My invention relates to the production of a new pharmaceutical product, a new antipyretic and antineuralgic, obtained by reducing nitro-phenetol, and melting the phenetidin-chlorhydrate thus formed with dried sodium acetate and acetic acid."

The appellant insists that this introductory paragraph must be read as comprehending the three known varieties of nitro-phenetol, namely, the meta, ortho, and para varieties, and hence that the paragraph is false and misleading, because, admittedly, only by the employment of the para variety, viz., para-nitro-phenetol, can the end product of the patent specified in the claim be obtained. But this opening paragraph does not affirm that the new pharmaceutical product can be obtained by reducing all nitro-phenetols, including the meta and ortho varieties. Nor is it open to any such interpretation when read, as it must be in connection with the context. Immediately after the introductory paragraph above quoted, we find in the specification this statement:

"In carrying out my process practically I proceed as follows: Fifty kilos of the potassium salt of para-nitro-phenol are mixed with three hundred kilos of alcohol, adding forty kilos of bromæthyl. The mixture is heated in an autoclave at a pressure of three to four atmospheres during about eight hours. At this time the reaction is finished, whereby para-nitro-phenetol is obtained according to the following equation."

And then follows a description in full, clear, concise, and exact terms of the successive steps of the inventor's process, whereby the "new mono-acetyl-para-mido-phenetol" is produced. The suggestion that the description commencing with the words, "in carrying out my process practically I proceed as follows," is only one specific example of the invention, is not to be accepted. There is nothing in the patent to support the suggestion. Undoubtedly the specification, as a whole, evinces that the invention is limited to the para product.

The expert testimony convincingly shows that it would be plain to every chemist reading this patent that the para variety of nitrophenol is the starting material for the production of the new antipyretic and antineuralgic, mono-acetyl-para-mido-phenetol, or phenacetine, covered by the claim.

We cannot see that Matheson v. Campbell, 24 C. C. A. 384, 78 Fed. 910, decides anything favorable to the contention of this appellant. The facts there differed radically from the facts of this case. The Hinsberg patent, unlike the patent involved in Matheson v. Campbell, is distinctly limited to one individual product, fully described and unmistakably identified.

The eighth and ninth assignments of error may be considered together. They relate to the Hallock publication, and the proofs generally of the prior art, as showing (as is claimed) want of novelty

in the product of the Hinsberg patent, and that it was the result of mere laboratory selection, and not of invention or discovery.

Prof. Sadtler, who was the principal expert witness for the defendant, and testified at length as to anterior publications and the prior art, mentioned particularly the Hallock article and a publication by Wagner. However, comparing the body referred to by Wagner (the acetyl derivative of meta-phenetidin) with the product of the Hinsberg patent, he testified thus: "The two compounds are distinct bodies, although they are isomeric, and therefore both possess the formula $C_{10}H_{13}O_2N$." And when asked (XQ. 95), "Excepting these Hallock and Wagner references, you do not know of any other description of the product claimed in United States patent No. 400,086 [the patent in suit] in the literature prior to February, 1887, do you?" Prof. Sadtler answered, "I do not." Furthermore he testified as follows:

"XQ. 93. Please examine the same references again, and point out where such a body of the formula $O_{10}H_{13}O_2N$, and having the characteristics of crystallizing in white leaves and melting at 135° C., is described, and quote the same into this record. A. I have already stated in answer to XQ. 91 that the body referred to by Wagner was a different chemical substance from phenacetine, differing not only in melting point, but, probably, in some other characteristics. The body referred to by Hallock, which I consider the same substance as that now known as phenacetine, did not have either melting point or formula directly ascribed to it by Hallock. XQ. 94. It is therefore a fact, is it not, that none of the publications prior to February, 1887, cited by you, contain any description whatever of the product itself, which is claimed in the Hinsberg United States patent No. 400,086 [patent in suit]? A. As I have stated, the Wagner reference contains the exact formula that is cited in the description of the product in the Hinsberg patent, but, with the exception of this agreement on formula, I do not know of any other correspondence in properties with those mentioned in the patent. The Hallock article, referring to the acetyl compound of para-mido-phenetol, only agrees with the description in the Hinsberg patent in mentioning the product as a crystalline solid, leaving the other physical properties entirely unnoticed."

The quoted testimony of the defendant's chemical expert, which is corroborated by other evidence, really puts out of the case the Wagner publication as a pertinent reference, and also enables us to shorten our discussion of the proofs bearing on the prior art. The Hallock article, under the title, "Note on Para-Nitro and Para-Amido Phenetol," was published at Baltimore in the American Chemical Journal of 1879–1880. The object of Hallock's note seems to have been the correction of a supposed mistake of Cahours, a French chemist, who had treated phenetol with fuming nitric acid, obtaining both a solid and a liquid product. Hallock states that he repeated Cahours' "experiments with somewhat different results." Of the product of his first reaction Hallock says, "The product consisted of a solid and a liquid in varying proportions, according to the conditions of the nitration;" but he nowhere shows the condition of nitration employed in his experiments. There is, indeed, much reason for believing that the Hallock article shows unskillful experimentation and also downright mistakes. For example, the oily liquid which Hallock assumed was para-monomido-phenetol he states boiled at 253° centigrade; but Dr. Schweitzer testifies that "para-monomido-phenetol boils at

244° centigrade, and a liquid boiling at 9° higher must be considered an absolutely different chemical individual"; and Dr. Chandler testifies to the same effect.

The only mention which Hallock makes of the crystalline solid which it is now said was phenacetine is found in the following paragraph, near the conclusion of his article: "These crystals, when treated with potassic hydrate, yield an oily liquid resembling aniline. It boils at 253° C. (uncorrected), and is doubtless para-monomido-phenetol. A portion of the salt appears to suffer decomposition, so that the amount of oil obtained was very small. This oil combines, like aniline, directly with acetyl chloride to a crystalline solid. In combination with carbon disulphide, it also yields a solid body." Prof. Sadtler therefore was quite right in stating that the body referred to by Hallock "did not have either melting point or formula directly ascribed to it by Hallock," and that "the Hallock article referring to the acetyl compound of para-mido-phenetol only agrees with the description in the Hinsberg patent in mentioning the product as a crystalline solid, leaving the other physical properties entirely unnoted."

These statements of Prof. Sadtler are very significant. Hallock did not investigate the crystalline solid. He made no test to identify it or to determine its composition. No one could discover from his article the nature of the crystalline solid referred to. Such vague data as he furnished were wholly inconclusive. Evidently Hallock did not consider the crystalline solid as possessing any value whatever. He did not regard it as worthy of investigation. His mention of it imparted no useful knowledge to the public. Certainly Hallock's article did not give phenacetine to the world. If there was any phenacetine in the crystalline solid it was not discernible. The crystalline solid as a whole was a poisonous substance. This much can confidently be affirmed. But even with the increased knowledge of the last 20 years no one can now determine with certainty what were the constituents of the crystalline solid mentioned by Hallock. The evidence shows that it may have contained one or more of nine different substances.

We have no hesitation in holding that the Hallock publication, supplemented by the whole body of evidence of prior knowledge, did not disclose the product of the Hinsberg patent, whether that product be regarded in its relation to the art of pharmacy or as a mere chemical substance.

We are not able to accede to the proposition that the product of the patent in suit was the result of mere laboratory selection, and not of invention or discovery. From a careful study of this record, we are convinced that what Hinsberg did involved invention and discovery of a highly meritorious character. The Hinsberg patent describes and claims an entirely new pharmaceutical product, which has found a very extensive and most valuable use as a medicine. The proofs quite justify us in accepting as correct the following views expressed by the complainants' chemical expert, Dr. Schweitzer:

"Hinsberg's invention is the invention of a new product. This product had never been produced or described or known or found any application in

the arts before Hinsberg. Concerning the process of acetylization it is true that at the date of the Hinsberg patent other amines had, of course, been subjected to processes of acetylization, and it was generally believed that amines could be acetylized if means suitable to each case could be devised. Para-mono namido-phenetol had, however, never been subjected to such a process, and when Hinsberg found his process it resulted in a new and useful result, namely, a new product of surpassing utility, which result could not have been foreseen."

The seventh and sixteenth assignments of error involve the question of the date of Hinsberg's invention. We are of opinion that the court below did not err in accepting the date of the publication in the Centralblatt, namely, February 26, 1887, as the true date of Hinsberg's invention. That publication was put in evidence by the defendant himself. He may, indeed, have intended to use it for another purpose, but the publication was in the case as evidence for every legitimate purpose. Moreover, the defendant examined Prof. Sadtler in respect to the publication, and he testified as to its contents. Among other things he said:

"Perhaps I should add that the term 'acetphenetidin' is the synonym of mono-acetyl-para-mido-phenetol, and is the name by which Hinsberg called it in his Centralblatt article in 1887, and in the same article he called it ethylated and acetylated p-amido-phenol."

Again, the defendant stipulated as to the identity of the Hinsberg of the Centralblatt article with the Hinsberg of the patent in suit. We think that the Centralblatt article, even without Prof. Sadtler's testimony, sufficiently identified the subject-matter of the Hinsberg patent.

The view we have thus expressed under this head makes it unnecessary for us to consider the publications in the Rundchau for March and April, 1887; the Pharmaceutischa Post of May and October, 1887; and the Journal of the Society of Chemical Industry of March 31, 1888.

The third and fourth assignments of error relate to the construction of the claim. The patent in suit describes a new product with such clear marks of identification that it can readily be recognized aside from the process for making it. The patent also describes a process for making it which was new, and up to the present time is the only known process by which it can be produced. Since, then, there was novelty both in the process and product, Hinsberg might have had one claim for the process and another claim for the product. Rubber Co. v. Goodyear, 9 Wall. 788, 796, 19 L. Ed. 566; Merrill v. Yeomans, 94 U. S. 568, 569, 24 L. Ed. 235. But he made the single claim quoted at the opening of this opinion. That claim, in terms, is for the described product, having certain distinguishing characteristics which are set forth in the claim with great fullness. In our judgment, it is very clear that the claim is not restricted to the product made by the described process, but covers the chemical individual, however produced. We know of no rule requiring a construction limiting a claim for a chemical product to the described process, because the evidence shows that it cannot be made in any other way than by the process recited. No warrant for such a rule is to be found either in the statute or in the decisions.

The 17th, 18th, 19th, and 20th assignments of error relate to the tests of identity specified in the claim, it being contended by the appellant that one of these tests, namely, "not coloring on addition of acids," is false, and the patent, therefore, void. The allegation is that the color test fails under the application of nitric acid. To sustain this defense, reliance is placed mainly, if not altogether, upon the testimony of Prof. Sadtler as to tests made by him, and an article by Hinsberg (the inventor) and Autenrieth published in the Archiv der Pharmacie in 1891.

It seems to us clear, under the language of the claim, "not coloring on the addition of acids," as well as under the proofs in the case, that if nitric acid is employed as a test it should be applied in such a manner as one skilled in the art would adopt for that purpose. It would not be a fair test, within the terms of the patent, to apply nitric acid at such a degree of strength as to destroy the phenacetine. The "addition" of an acid simply as a color test negatives the idea of such excess as to work decomposition or conversion of the phenacetine. Furthermore, the color test of the patent implies the use of acids under normal conditions and in the usual way. Hot acid is not suggested or implied, nor is a protracted test. These views are not only rational in themselves, but they have the support of the complainants' expert witnesses, Dr. Chandler and Dr. Schweitzer.

In respect to the color test mentioned in the patent, Dr. Chandler testified thus:

"I understand that the product of the patent is not colored when subjected to the action of acids in general, which simply act as acids, such as sulphuric, hydrochloric, acetic, etc., and nitric acid sufficiently dilute to act merely as an acid, but not strong enough to exert a peculiar action which no other acid can exert, and which it exerts only when strong enough to produce a nitro compound, by introducing into the substance in place of an atom of hydrogen the radical nitryl (NO), which no other acid in ordinary use contains."

Now, what the character of Prof. Sadtler's treatment of phenacetine with nitric acid was will appear from the citations from his testimony, given below. Upon his examination in chief he said:

"I did find that ordinary nitric acid of U. S. Pharmacopoeial strength, either hot or cold, did change its color immediately. In fact, I found that ordinary nitric acid not only colors it a decided citron yellow, but it has an energetic chemical action upon it, developing heat, liberating nitrous fumes $(N_2O_4)$, and changing it into a compound, which, upon cooling, crystallize out in yellow needle-like crystals. I also found that on a short heating with the addition of hydrochloric acid some decomposition took place with liberation of para-amido-phenotol, when the addition of a few drops of dilute solution of chromic acid caused a deep ruby color to appear."

Upon cross-examination Prof. Sadtler said:

"I have not tried it with the official dilute nitric acid of the Pharmacopoeia, as far as I know. XQ. 69. Is it not true that phenacetine must necessarily be converted into a nitro compound when, under the treatment with nitric acid, the yellow color appears? A. Yes; there must be some formation of the nitro-phenacetine, as far as I know, to produce the yellow color of the product."

At a later date, upon a re-examination in chief, Prof. Sadtler testified:

"I prepared some dilute nitric acid of the exact strength (10 per cent.) of the acidum nitricum dilutum (U. S. P.), and, putting some in a test tube, added to it some phenacetine Bayer, and, corking the tube to prevent evaporation of the liquid, left it in my laboratory in the cold. When I looked at it the next morning, it had stood seventeen hours. The liquid was yellowish throughout from the result of the action and the nitro-phenacetine dissolved, and, on examination of the portion undissolved in the bottom of the test tube, I recognized, under the lens, the change of a portion of the white phenacetine into the yellow crystals of the nitro-phenacetine. A second experiment made in a watch crystal, loosely covered, turned out the same way. Acidum nitricum dilutum will therefore act in the cold after some hours."

It is quite plain to us that these experiments of Prof. Sadtler were outside of the color test of the patent. They involved the use of strong nitric acid, which was destructive of the phenacetine, or the use of heat, or the standing of the phenacetine in cold acid for 17 hours. It is to be noted, too, that in the latter case the change of color was recognizable only under a lens.

Speaking of the color test of the patent, Dr. Schweitzer testified:

"In making this test, to add heat, or to take strong nitric acid, or to allow it to stand for seventeen hours, is, in either case, an abnormal mode of procedure, which no person skilled in the art would have adopted, and which is therefore not included within the description of the test in the claim as the same would have been understood by a person skilled in the art."

As the article in the Archiv der Pharmacie was published in 1891, subsequent to Hinsberg's assignment of his invention, and two years after the issue of the patent to his assignee, it may be doubted whether it was evidence against the complainants below for any purpose. But, waiving this point, upon an attentive reading of the article we do not see that it tends to prove the falsity of the color test recited in the claim. The article really discloses a new and additional test for the identification of phenacetine by its nitration. It states that "if finely powdered phenacetine is covered with 10 to 12 per cent. nitric acid, and heated a short time to boiling, the liquid takes a yellow to orange color, and at the same time the hitherto colorless phenacetine is changed into an intensely yellow colored nitro compound." Again, it is stated that the quantity of nitric acid thus used is about double that demanded by the theory, and that the mixture is to be heated to boiling, and shaken vigorously for some time. The article further states that the nitration can be effected by shaking up the finely powdered phenacetine with dilute nitric acid, and adding concentrated nitric acid in slight excess in small portions, and with energetic shaking. The directions in this publication, we think, show a test additional to, and not inconsistent with, the statements contained in the claim of the patent. The defense based on the alleged falsity of the tests of identity specified in the claim is not sustained by the proofs.

Under the remaining assignments of error, viz., the 1st, 2d, 5th, and 6th assignments, we are called on to consider only one other question, namely, that of infringement. That question is free from difficulty. The identity in all particulars of the article sold by the defendant with the product made in accordance with the patent in suit is clearly established by the proofs. The article sold by the de-

fendant responds to all the tests specified in the claim of the Hinsberg patent. Upon this point there is no conflict of evidence. Infringement then is sufficiently shown, even if the claim were held to be limited, as the appellant contends it should be, to the product when made with the materials and by the process described in the specification. None the less conclusive, of course, is the proof of infringement under the broader construction we have given to the claim.

Upon the most patient investigation of the case, we are persuaded that the record is free from error, and that none of the assignments should be sustained.

The decree of the circuit court was right, and accordingly it is affirmed.