RICKARD et al. v. DU BON.

(Circuit Court, D. Connecticut. August 28, 1899.)

No. 972.

1. PATENTS—INFRINGEMENT—ART OF MATURING TOBACCO LEAVES.
   The Rickard and Long patent, No. 604,338, for an improvement in the art of maturing tobacco leaves, which, as described, consists in spraying the leaves of the growing plant, at about the time they reach maturity, with alkali in solution, such as potash, which gives them a spotted appearance, if valid, can only be sustained on the claim that such treatment promotes the burning quality of the leaf when used as a cigar wrapper; and, although its claims are broader, it cannot be construed to cover the use for such spraying of an alkali which is not a combustion-producing agent.

2. SAME—CONSTRUCTION OF CLAIMS.
   A broad claim to include an entire class as equivalents,—as all alkalies,—cannot be sustained where some members of the class do not possess the properties required to accomplish the only result which can give validity to the patent.

This was a suit in equity by Clyde A. Rickard and Edward N. Long against John A. Du Bon for infringement of a patent. On final hearing.

Pennie & Goldsborough and Francis T. Chambers, for complainants.

William E. Simonds and Arthur L. Shipman, for defendant.

TOWNSEND, District Judge. The bill and answer herein raise on final hearing the questions of validity and infringement of complainants' patent, No. 604,338, granted May 17, 1898, to Rickard and Long, for the "art of maturing tobacco leaves." It will be necessary first to review the history and explain the status of this unique case. For a cigar wrapper it is desirable to have a neutral leaf, without such a pronounced tobacco taste as to interfere with the flavor of the filler, and of a light color, which burns better. Sumatra tobacco leaf, because it possesses these qualities, is greatly in demand as a wrapper for cigars. It is more generally spotted than any other tobacco, and, when so spotted, its value is greatly enhanced. Spotted tobacco generally commands a higher price than plain tobacco. Whether this is because it is supposed to be Sumatra tobacco, or because the presence of the spot indicates a better quality, is not clear. The fact of the superior quality and higher price of spotted Sumatra having attracted the attention of Messrs. Rickard and Long, they instituted a series of experiments to pro-

duce an imitation of said tobacco, which culminated in the patented process. This process consists in spraying "the leaf, while the plant is still growing, at about the time the leaves have reached their maturity," with an alkali in solution, such as potash, which it is alleged in the specification "would greatly increase the burning quality of the leaf when used as a wrapper; and it has been found that the chemical is more thoroughly distributed throughout the body of the leaf by applying the same to the leaf in spots, and allowing the leaf to absorb and assimilate the chemical." The claims of the patent are as follows:

"(1) An improvement in the art of treating tobacco leaves, which consists in applying a combustion-promoting agent to the leaves of a growing plant, substantially as described. (2) An improvement in the art of treating tobacco leaves, which consists in applying an alkali to the leaves of a growing plant in spots, substantially as described. (3) An improvement in the art of treating tobacco leaves, which consists in applying a mixture of potash and glycerine to the leaves of a growing plant in spots, substantially as described."

The first of the various defenses to be considered is the claim that the patent is void because of lack of utility. That the prime object of the patentees was to produce a fraudulent imitation of Sumatra is conclusively established by the following statements in the original specification:

"This invention relates to the art of treating tobacco leaves which are employed as wrappers for cigars, and it has for its object to provide a process for discoloring the leaves in spots, so that the same will accurately and truly simulate the well-known spotted Sumatra wrapper or tobacco leaf. As is well known, the Sumatra wrapper, or tobacco leaf, is provided with a number of isolated, discolored spots, which appear more or less white, and which make their appearance during the growth of the plant. These spots being present in certain Sumatra tobacco leaves, the tobacconist and purchaser can always readily identify the leaf, and such spots, therefore, amount practically to a trade-mark in themselves, which at once indicates that the wrapper or leaf is a Sumatra export. The quality of a Sumatra leaf is commonly believed to be somewhat superior to an American leaf, and this fact, taken in connection with the duty levied thereon, gives the same a high marketable value. These facts are mentioned to emphasize the characteristics of a Sumatra wrapper, or tobacco leaf, and also to emphasize the great desirability of reproducing the Sumatra spots in other tobacco leaves. This invention, therefore, contemplates providing means for discoloring a tobacco leaf in spots, so that its identity cannot be distinguished from the ordinary Sumatra leaf; and to accomplish this result it is designed to employ such chemical or other means as will partially deaden the life of the leaf in isolated spots, so that such spots will become discolored, and partially or completely bleached, while at the same time remaining sufficiently soft and pliable so as not to destroy the usefulness of the leaf as a wrapper for cigars."

The examiner of the patent office rejected the application, and found, inter alia, as follows:

"The specification clearly shows that the object applicants have in view is deception. Heretofore cigar manufacturers and leaf-tobacco dealers have had to depend upon their supply of spotted tobacco only as nature produced it in or on the leaf; and as the spotted leaf is only a small percentage of the leaf grown, and as almost every smoker selects a spotted cigar in preference to one not spotted, the demand is greater than the supply for spotted cigars, and the competition among cigar manufacturers for the spotted leaf has made the price of it advance very much, leaving large quantities of the unspotted leaf on the market, almost unsalable. * * * To imitate this

spotted disease in a purely mechanical way by the application to the growing plant or the gathered leaves, and to sell domestic tobacco in competition with the imported Sumatra tobacco on the basis of the spotted character of the leaf, is a deception and a fraud."

The attorneys for the applicants thereupon amended the application so as to state as the only reason for spotting the leaves the increasing the burning qualities thereof. This application was rejected by said examiner, and on appeal by the examiners in chief, on the ground that "the main, and practically the sole, purpose of applying a chemical to the leaf in spots is to imitate the Sumatra leaf." The examiners add:

"Even if this had not been stated in the specification as originally filed, it would still be apparent that this, and this only, is the real purpose. The fact that it was originally stated to be the purpose only serves to confirm the belief that this is the real purpose."

On appeal to the commissioner of patents, however, new evidence of utility was introduced, and he reversed the decisions of the examiners, saying:

"Appellants have now disclaimed all intention of using the process fraudulently," and, as "the evidence of experts leads me to believe that the process is useful for some purpose, the appellants are entitled to a patent."

Although I am inclined to agree with the conclusion of the examiners, rather than that of the commissioner, yet because of the peculiar character of the monopoly afforded by a patent right, and of the public interest therein, it has seemed desirable to assume the correctness of the decision of the commissioner of patents that the patent is not void on the ground of fraud, and to determine the question of the utility of the patented process. The testimony on the point of utility is conflicting. Complainants' witnesses assert that tobacco artificially spotted with potash by the patented process ripens earlier, and contains a lesser amount of gum, and therefore burns better. Defendant's witnesses assert that this process seriously injures the tobacco by making holes in the leaf, by darkening it, by diminishing the available crop, and by materially injuring the burning quality of the leaf. And yet these same witnesses are confessed infringers, who, in spite of these disastrous results in the first year, have hastened again to invite disaster and tempt Providence the second year, and who have urged a speedy disposition of the case in order that they may have time this year to vie with the patentees and their licensees in deceiving the public, free from the peril of an injunction against involving themselves in ruin. In these circumstances it would, perhaps, be proper to dispose of the case on the familiar principles applied by courts of equity where the parties are in pari delicto: For the reasons already stated, the case will be disposed of on the merits. The only claim of utility, except to deceive, on which this patent can possibly be sustained, is that its process may promote the burning quality of the leaf. Defendant uses a solution of caustic soda, burnt sugar, molasses, and glycerine. It is proved that caustic soda is not a combustion-producing agent, therefore it does not infringe the first claim, and cannot be the equivalent of potash in the one feature essential to give validity to the patent, and therefore does not infringe the

third claim. If, however, as is claimed by complainants, caustic soda is the equivalent of potash, the third claim of the patent is invalid for lack of utility. The second claim is for the use of an alkali, substantially as described, thereby including any alkali such as potash. The fact that one kind of alkali, such as potash, namely, caustic soda, does not promote the burning quality of the leaf, and the lack of evidence that the patentees had ever experimented with other alkalies, show that the second claim is void either for lack of utility or because it is broader than the alleged invention. In Matheson v. Campbell, 24 C. C. A. 389, 78 Fed. 916, it was decided that a patentee "cannot speculate upon equivalents of his claims of invention, and thereby cause the public to resort to experiment in order to determine the scope of the claims of his patent." If the second claim can be sustained at all, it must be so construed as to include only such alkalies as improve the burning quality. In any event, defendant, in making spotted tobacco, has only appropriated the deceptive and fraudulent element of complainants' patent, but, as he has not improved the burning qualities of the tobacco by the use of the alkali of the second claim, or of the potash and glycerine of the third claim, he has not infringed.

These conclusions dispense with the necessity of considering the further defenses that the patent is void because it covers a method an essential element of which is the function of a plant, or because it lacks patentable novelty, or because the specification is insufficient. Let the bill be dismissed.