## POLYGON PRODUCTS CORPORATION v. KANT–RUST PRODUCTS CORPORATION et al.*

(Circuit Court of Appeals, Third Circuit. July 5, 1923, as Modified November 9, 1923.)

### No. 2980.

**Patents ⬤⟿328—1,333,363, for compound for penetrating interior corrosion, held to disclose invention, and claim 2 held infringed.**

The Abbott patent No. 1,333,363, for a compound for penetrating interior corrosion, which consisted of a penetrant, which was a hydrocarbon of low viscosity, a material colloidally soluble therein, and a relatively viscous lubricant, *held* to disclose invention, especially in view of its remarkable success in a new art, and claim 2 thereof *held* infringed by defendant's product, which contained elements answering to that description, though the materials were not those mentioned in the specification.

Appeal from the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Suit in equity by the Polygon Products Corporation against the Kant-Rust Products Corporation and others, for infringement of a patent. From a decree dismissing the bill (291 Fed. 702), plaintiff appeals. Reversed and remanded, with directions.

Alan M. Johnson, of New York City, and Ellis Spear, Jr., of Boston, Mass., for appellant.

Egner & Beatty, of Newark, N. J. (George W. Case, Jr., of New York City, and Henry W. Egner, Jr., and Lloyd G. Beatty, both of Newark, N. J., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. On March 9, 1920, there was granted to Charles Matthew Abbott, assignor to Polygon Products Company, the plaintiff, patent No. 1,333,363, for a compound for penetrating interior corrosion. Thereafter the plaintiff filed a bill charging defendant with infringing sundry claims thereof. On final hearing the court below, in an opinion reported at 291 Fed. 702, held infringement was not shown, and from a decree dismissing its bill, the plaintiff took this appeal.

In view of the novelty of the disclosures of this patent, and because we have arrived at a different conclusion from that of the court below, we deem it proper to set forth at some length the reasons thereto moving us. In doing so, we will follow the course laid out by the patentee, who, in his specification said:

"* * * This invention is capable of a great variety of use. Its function in the removing of rusty nuts is so illustrative and so readily understood that the invention will be herein discussed largely with relation to its use for such a purpose and under such conditions."

Of course, the self-penetrating power of oils was always recognized as an aid in unscrewing rusted bolts and nuts, but the fact remained that the physical force of the wrench, tongs, chisel, and hammer was the used method. Into this field of the metal art, as we view it, Abbott, an experienced chemist, in making his invention, brought into

practical, commercial, and novel use the science of colloidal chemistry, which, though theoretically known for some years, has only of late ones been practically applied to the metal and clay arts. In that respect, Prof. Jackson, now of Columbia University, and for 16 years prior chief chemist and director of the Municipal Laboratories of New York, referring to colloid chemistry, said:

"It is comparatively new. Only within the last 5 or 10 years has it been practically applied to industrial work. Certain theories regarding it have been in existence since 1862, when Graham, who was supposed to be the father of colloid chemistry, propounded his ideas regarding these substances or this state of matter. But as applied to the industries, as far as I know, it has not been taught in any university, except Columbia, and only there for the last 3 or 4 years."

It was into this unoccupied field of major metal corrosion, in which interior fluid penetration played no effective part, that Abbott entered and made a novel, useful, and inventive use of colloids and lubricants, through the aid of penetrants; the two former being the effective anti-corrosion elements when the interior of the corroded zone was reached, and the penetrant being the carrier that freighted them to an effective working station. The agencies and process are clearly stated in his specification as follows:

"Taking, therefore, for example, the problem of loosening a nut having its threads rusted or otherwise corroded, or held against rotation, it is to be noted that, the larger the nut or other part to be removed and the greater the rusted or otherwise united surfaces, the more difficult and the more inaccessible the cause of trouble becomes. Obviously a small nut, which requires little force to turn, may under certain conditions be wrenched free, even though seriously rusted or otherwise held, but in the case of large nuts and other forms of threaded fastenings, where the bearing surfaces are of considerable extent and where multiple threads of low pitch and normally close fit are employed, the problems of reaching interior rust and the like have been so difficult as to have been considered impracticable.

"In addition to actual reaching of interior rust by a disintegrating agent, there is in most practical situations a need also for the presence in the locality of the interior rust of a lubricant, as most rust or corrosion is not eliminated, initially at least, but merely loosened, and the presence of a lubricant greatly facilitates the initial relative movement, which permits the loosening and ultimate removing of the parts. The problem, therefore, involves not only the presence of a penetrating agent capable of disintegrating rust or other corrosion, but also a penetrating lubricant. Here, again, there is difficulty on account of the reluctance of viscous lubricant to enter capillary tubes or planes, and difficulty of holding against volatilization both a lubricant and a corrosion penetrant capable of penetrating such minute interstices. I have overcome, however, these difficulties by a combination of factors, in which I combine a lubricant and a corrosion penetrating agent in such a way as causes the lubricant to act as a carrier, having the function of retarding or practically preventing the evaporation of the corrosion disintegrant, while permitting the latter perfect freedom of penetration, while the corrosion disintegrant still retains its penetrating quality, co-operates with its lubricant as a carrier and in giving thereto a penetrating character."

These elements, the penetrant, lubricant, and colloid, each limited to certain characteristics, Abbott embodied in his second or generic process claim as follows:

"The process of releasing rust films between adherent surfaces which consists in applying to the surfaces a liquid hydrocarbon of low viscosity and a material colloidally soluble therein and a relatively viscous lubricant."

It will thus be seen that not all penetrants, every lubricant, or any colloid are used in his process, but, first, the penetrant must be "a liquid hydrocarbon of low viscosity," or, as stated in the specification:

"The penetrant in turn must bear certain relation to the lubricant, as well as to the material upon which the compound is to be used; that is to say, the penetrant must not chemically react with the metal or material of the part or mechanism to be treated, must not have any reaction with the lubricant, and preferably is a solvent for the lubricant."

Second, the lubricant has also certain limitations and characteristics, or, as stated in the specification, it has—

"the function of retarding or practically preventing the evaporation of the corrosion disintegrant. * * * The lubricant must have the same absence of reaction upon the parts. * * * The lubricant should furthermore have as a property, a retarding effect upon the volability of the penetrant."

And, third, the colloid is likewise of a particular kind, for, as stated in the specification, it, as well as the lubricant, must be of low viscosity, must be soluble and capable of forming a protective, viz.:

"The colloid preferably is colloidally soluble in the combined penetrant and lubricant, and preferably tends to increase the viscosity as little as possible. The colloid must therefore bear a certain relation to the material used as the penetrant and lubricant. * * * The colloid should therefore be of average maximum efficacy for forming a protective colloid for those forms of rust or other causes of sticking most common in practical usage."

The operation of the compound is clearly explained by Prof. Jackson who testified:

"A: The patent includes the penetrant; that is, light liquid oil, which will crawl or travel through very fine interstices, and which will carry with it a certain ingredient called a 'colloid.' This colloid is a material which is in an extremely fine state of division, not in actual solution, but between a suspension and a solution. These materials have a very marked physical state, different from suspensions, and different from solutions. In this case the colloid serves to keep the penetrant from volatilizing to any great extent, or at least reducing its volatilizing action, and also serves to break down or plasticize the rust when it gets into the internal part of the rusty bolt, or nut, or whatever it may be. Colloid materials of this kind have that physical characteristic of making a coarse or rough material become finer and more plastic, and more unctuous to feeling. This colloidal action is what is brought about when the penetrant of light oil carries it through into the nut or bolt. The other part of the claim introduces a lubricant as well. This lubricant is merely for the purpose of still further increasing the smoothness of the surfaces, whereby they may be opened up. The lubricant alone would not accomplish the object, because it would be too thick; could not get in; could not get in where the rust occurs. So it is necessary to have a penetrant to carry it in, and the penetrant may carry in the lubricant by rendering it less viscous, more easy to travel through, and it also may carry in the colloid, so that the action of the penetrant with this colloidal matter and with the lubricant is to break down a hard, coarse, rusty material and plasticize it, make it smooth and unctuous, and consequently easily turned with a wrench in case it is a bolt."

Now, if we consider a penetrant, which is a light oil, tar oil in this case, traveling into these interstices between the particles, and carrying with it a colloid, or a colloid and a lubricant, this introduces into the system a material which renders these particles plastic, coats them over, so to speak, with a material which separates them from each other, and then, of course, the lubricating oil, which also goes along with

it, renders it more smooth than it would otherwise be, so that, when the material is turned, the particles, instead of sticking together, all separate from each other, and fall apart and slide over each other, and plasticize and become smooth. That is the idea of the action of the colloid, assisted by the lubricant, which is carried into place by the penetrant; those three being the substance of the patent.

The novelty and efficiency of the product were such that, when first called to the attention of men in the metal arts, they would not believe it possible that the compound would do what was claimed, and the plaintiff was therefore obliged to spend $50,000 in demonstration work in machine shops in order to create a market in that art. We refrain from quoting from the uncontradicted proofs as to the unlooked-for efficiency of the compound, simply citing the defendant's record admission that—

"We will concede that their product accomplishes any wonderful result they want to read into the record."

Finding, then, in Abbott's disclosure, in a high and unusual way, the several elements, of marked originality in a practically unoccupied field, of surprising efficiency, of prompt acceptance when its novel and unexpected accomplishment was practically demonstrated, we have every reason why, and no reason why not, this disclosure should not be held inventive in character. We accordingly hold the patent valid.

Does the defendant infringe? Our conclusion in that regard is that its compound and process comprise three elements: First, a penetrant, which, in this case, is coal tar oil; second, a colloid, which is graphite; and, third, a lubricating oil. These elements, penetrant, colloid, and lubricant, each embody the character of the penetrants, colloids, and lubricants specified in the claim quoted, and answer to the several descriptions thereof previously quoted herein from the specification, and they all act in and upon and with each other to plasticize and break down the rust binder in joints, nuts, and the like. The objection that some of these elements are not mentioned in the specification carries no weight. Abbott was not bound to foresee and state every substance that could be used. To require that would be to require prophesy as to the price of patenting. He disclosed his principles; he stated the characteristics of a penetrant, a colloid, and a lubricant adapted to use in his process; he carried those characteristics into his claims, and when the defendant has chosen materials unnamed in the specification, but possessing the characteristics pointed out as incident to the successful working of Abbott's process, it is clear that these elements, while absent in the body of the specification, are present in its spirit. To hold otherwise were to shear real invention of real protection.

Finding as we do, the claim quoted above valid, and that the defendant in its mixture uses each of the elements of such claim, the defendant should be adjudged an infringer thereof, and as we are of opinion the other claims involved, viz. the third, fifth, and sixth, are also valid and infringed by defendant, the decree below, dismissing the bill, should be reversed, the bill reinstated, and the cause remanded, with instructions to enter a decree adjudging claims 2, 3, 5, and 6, valid and infringed, and that an injunction be awarded and an accounting directed.