PHILIP A. HUNT CO. v. MALLINCKRODT CHEMICAL WORKS.

Civ. No. 5371.

District Court, E. D. New York.

July 14, 1947.

Mock & Blum, of New York City (Asher Blum, of New York City, of counsel), for plaintiff.

Henry A. Stickney, of New York City (Daniel L. Morris, of New York City, and Delos G. Haynes, of St. Louis, Mo., of counsel), for defendant.

BYERS, District Judge.

Decision is required concerning the validity of defendant's U. S. Patent No. 2,-168,756 to Donald B. Alnutt, assignor to defendant, granted August 8, 1939, on Application of May 9, 1938, for "Acid Resist Powder for Use in Etching", and whether plaintiff's unpatented products infringe.

The plaintiff seeks declaratory judgment of invalidity and non-infringement; and defendant counterclaims, seeking an injunction and damages.

Subject-Matter:

In the art of photo-engraving, a picture or design is etched upon a metal plate from which reproduction is possible. The etching is accomplished by the action of acid on the plate upon which the picture or design has been printed from a photographic negative in much the manner that a photographic print is made upon sensitized paper. The acid eats into the plate as outlined by the transferred pattern; and in order to carry the etching process to completion so that the final reproduction shall present a picture having substance and depth, the acid treatment has to be repeated three times; between each of the treatments, however, the side walls of the channels which have been cut by the first have to be protected against the subsequent action of the acid. That is, the acid treatments subsequent to the first are confined to etching or cutting deeper channels in the surface of the plate as may be required, but lateral reaction in the channels must

be prevented to avoid under-cutting, so to speak. That result is accomplished by building a protective side wall in each channel, capable of resisting the acid of the later treatments.

The building material is known as acid resist powder, which falls into the channels as the result of being brushed across the surface of the plate after each application of acid. The brushing is in four directions to insure complete distribution of the powder along the sides of each channel. Following the brushing, the plate is heated sufficiently to cause the powder to fuse, and on cooling it solidifies so as to form the desired wall. The plate is then ready for another acid application, since the etching action will now be confined to the bed of the channel already cut. The operation can be repeated according to the desired number of acid treatments.

It will be realized that such a powder, to function successfully, must be so constituted as to possess several characteristics or physical properties the presence of which is requisitioned by the peculiar requirements of the office which it serves.

The Patent explains these matters in the specifications so that the claims are rendered understandable; those in issue are 1 to 5, inclusive, and 9.

The Patent Teaching:

The specifications assume an understanding of the office of such powders which has been stated above, and recites the prior use of a powder containing a natural resin, dragon's blood, which is the exudation of trees which grow in the Far East. As it came upon the market in the United States, the resin content was combined with foreign matter, sand, earth, vegetable matter, etc., fortuitously or otherwise acquired, which had to be removed. Since it could not be used alone, even in this cleansed condition, the addition of a filler of mineral content was necessary if a workable agent were to be produced. The final outcome was a powder commercially known as dragon's blood.

The Patent is for an improved powder, said to be an artificial substitute embodying the physical properties of the naturally produced article.

The patentee says: "Its chemical composition, on the other hand, is not in any way related to dragon's blood. Each component is selected with respect to its adaptability to produce a desired physical effect in the properties of the powder without regard to the chemical composition of such component." It is stated that uniformity of product is thereby secured. Thus: "A product of this nature offers great advantages over natural dragon's blood by reason of the fact that, *being made from substances of known composition* (italics supplied), succeeding batches can be compounded with the utmost uniformity." Slight variances in the proportions are commended with reference to specific requirements.

The emphasized words will bear watching.

The composition is made up of "resinaceous material", and "filler material", which are the prime ingredients; also adhesion and lubricant powders and coloring material which can be thought of as of secondary importance.

The patentee's definition of resinaceous material is: "The term resinaceous material wherever used is intended to refer to such a resin or wax (i. e. a single resin or wax, of either natural or synthetic origin, or it may be a mixture of two or more such natural or synthetic products), or, to a mixture of such resins or waxes."

Eight desirable physical characteristics of such a resinaceous material are listed and it is said that they should be present in reproducible fashion.

It is observed that while natural dragon's blood "may fulfill (possess?) all of the foregoing characteristics", because it occurs in nature it is not of reliably uniform composition "so that it cannot be used as the resinaceous material of the present invention without sacrificing the desirable advantage of uniformity of characteristics".

Apparently the patentee asserts that his definition of "resinaceous material" is broad enough to include dragon's blood as a natural resin, while at the same time he warns against using it; he cannot be permitted both options, and for the purpose of this

decision his claims will be interpreted as excluding dragon's blood as a natural resin within the disclosure of his asserted invention.

He then proceeds to explain how he makes one approved synthetic resin by combining 1 part of carnauba wax with approximately 4 to 5 parts of a synthetic phenolic base resin product made by placing 1200 grams p-tertiary amyl phenol and 500 grams aqueous formaldehyde (37½% CH₂O) in a round bottom flask having a reflux condenser; the mixture is heated, hydrochloric acid is added, the mixture is refluxed for three hours "during which time most of the formaldehyde combines and a resin is formed". Condensation for distillation is effected, the water and hydrogen chloride being distilled off by heat; further heating, and removal of the unreacted p-tertiary amyl phenol is accomplished by applying 26" vacuum to the flask. The molten resin is then removed and cooled, and pulverized as required, and has a softening point of about 83½°C. The resin so synthesized is not stated in the terms of a chemical formula. The mixture with carnauba wax, in the stated proportion, constitutes a suitable resinaceous material for the purposes of this invention.

The foregoing has been set forth because it is the feature of this patent which distinguishes it from the earlier Application (Serial No. 72,061, filed April 1, 1936) which was rejected for insufficiency of disclosure, and of which this patent is stated to be a continuation.

The continuation feature is of moment in this controversy.

The synthetic resin so formed can be economically substituted by one bearing the trade-name "Durez S-5758", which the patentee is informed is a phenol-formaldehyde resin of the thermoplastic type modified with a resin plasticizer sold under the trade-name "Santicizer B-16", which is "the substance butyl phthalyl butyl glycollate" which is described at length, together with the manner in which it is used to plasticize resins, in an article by etc. "Sufficient plasticizer is added to and worked into the thermoplastic phenol-formaldehyde resin to bring the melting point of the resin to the proper value."

The use of the alternative synthetic resin is not seen to add scope to the disclosure of this patent. The earlier Application was rejected because the designation of "Durez S-5758", as a phenol-formaldehyde resin plasticized as stated, failed to designate the *resin* "with that particularity required for its reproduction". See Office Action of November 27, 1937, in Exhibit 3.

The instant specification then passes to the second primary ingredient, namely, the filler which adds "body to the finished product", so that heating on the plate carrying the etching does not cause the powder to spread or flow. The necessary properties are such as to enable the powder to be water-repellent and acid-resistant, when the filler material has been finely pulverized. Suitable fillers are soapstone (which, being pulverized, has a "somewhat micaceous structure"), the natural mineral natine, and thoroughly cured synthetic resins of the phenol aldehyde type. (See bottle caps and the like.)

As to this kind of filler it is said: "In some instances, however, such a resinaceous filler will act in use somewhat as a combined resinaceous material and filler material, particularly if the operator uses high enough temperatures in 'burning in' the powder." Surely this is a cryptic statement. When the resinaceous filler acts as though it were resinaceous material, one is left to speculate where the one desirable property begins and the other leaves off.

The secondary ingredients are adhesion powder, the office of which is obvious, and lubricant powder apparently to insure clean brushing, and coloring material to promote recognition of the wall during formation by contrast with the etching plate itself. Examples of the first are aluminum stearate and thymol iodide. Powdered talc is an example of the second, and ferric oxide and dyes of the third.

The proportions of the ingredients found to be acceptable according to the patentee and the order of compounding are set forth. The preferred method of mixing the filler material into the melted resin is ex-

plained and the specification concludes: "As many changes could be made in carrying out the above compositions without departing from the scope of the invention, it is intended that all matter contained in the above description shall be interpreted as illustrative and not in a limiting sense."

This sweeping assertion is forecast in his solicitor's letter of December 4, 1936, to the Commissioner in connection with the earlier Application:. "Applicant is under no obligation to define the ingredients of his etching powder composition so narrowly as to prevent the use of their substantial equivalents."

For accuracy the claims in suit will be quoted:

"1. An acid resist powder comprising the following ingredients in approximately the stated proportions:

| | Per cent |
|---|---|
| Resinaceous material | 24–32 |
| Lubricant powder | 4–7 |
| Adhesion powder | 2–4 |
| Coloring material | ½–1½ |
| Filler material | Balance" |

"2. A composition of matter as set forth in claim 1 in which the resinaceous material includes a thermoplastic phenol-formaldehyde synthetic resin."

"3. A composition of matter as set forth in claim 1 in which the resinaceous material includes thermoplastic phenol-formaldehyde synthetic resin, and a wax substantially of the characteristics of carnauba wax."

"4. A composition of matter as set forth in claim 1 in which the resinaceous material includes a thermoplastic phenol-formaldehyde synthetic resin, and a wax substantially of the characteristics of carnauba wax, and the filler material comprises a finely pulverized micaceous mineral."

"5. An acid resist powder as set forth in claim 1, in which the lubricant powder consists of talc."

"9. An acid resist powder comprising of the order of one-fourth to one-third resinaceous material, one-half to three-fourths filler material, and one or more of the following secondary ingredients in the proportion stated:

| | Per cent |
|---|---|
| Lubricant powder | 4–7 |
| Adhesion powder | 2–4 |
| Coloring material | ½–1½" |

It should be understood quite clearly that the defendant's position is as stated in its closing argument, that this is not a chemical Patent; it is said to be a patentable combination of several substances having certain physical characteristics (namely, functional aptitudes) which cooperate when properly assembled in a new way to accomplish a new result. If understood, the argument is that resemblance is urged to a purely mechanical Patent for a new combination of old components, which accomplishes a result not previously known. So much is consistent with the language quoted above (page 1, column 2, line 15).

Probably the defendant is making virtue of necessity in so contending, since it asserts not only the right to exclude others from making use in combination of the substances which it has disclosed, but all others which may be regarded as their equivalents.

The Plaintiff's Products:

The plaintiff manufactures and sells acid resist powders made according to secret formulae which were disclosed in camera, and the seal is not required to be broken for the purposes of this decision.

Prior Use:

The defendant's product was marketed more than two years prior to the Application date of the Patent in suit; if the latter, however, is entitled to the Application date of the prior abandoned Application date, on the theory that this is a continuation thereof in part, the question disappears from the case.

The plaintiff's product known as 160, a dragon's blood etching powder, was made and sold more than two years prior to the earliest filing date of Alnutt, the patentee, and whether that is such a prior use as to deprive the Patent of validity, requires decision.

Validity:

There are no prior Patents teaching an acid resist powder, so that comparisons touching novelty are not required. The

idea of adapting a synthetic resin to the known requirements of such a compound seems to have originated with the Public Printer, in his report of 1932, for it is therein stated that the variability of dragon's blood, when employed as the main constituent of acid resist powders, pointed to the wisdom of developing a compound of synthetic resin with inert fillers, in order to insure reasonable uniformity of product and hence of performance; that appropriate experiments had been initiated in the laboratory of the Public Printer and were being there conducted as at the date of the report. The following year, progress was reported, but success was said not yet to have been achieved.

Evidently Alnutt, this patentee, applied himself to the task thus broached, with the result shown in his first (abandoned) Application.

The literature shows that the synthesis of resin from coal tar products was not new during any of the years involved in this inquiry, so that Alnutt was conducting his experiments in a field of endeavor which was by no means virgin territory. Indeed the 1933 report, above mentioned, speaks of 25 different synthetic resin mixtures as having been made and studied in the experimental laboratory.

With this understanding, it is necessary to consider the broad proposition of whether that which is essentially a chemical combination can become the subject of a valid Patent the claims of which are not stated in the terms of a chemical formula, but in the physical characteristics of designated substances which may be possessed also by a large number of other substances—that is, what they do instead of what they are—and thus exclude public use not only of the revealed combination, but of any combination of synthetic substances manifesting like physical properties when so compounded, to perform a given office.

The defendant's first reliance is upon the presumption of validity arising from the grant of the Patent. It is true that as lately as 1944 in International Carrier-Call & Television Corporation v. Radio Corporation of America et al., 2 Cir., 142 F.2d 493, at page 495, mention is made

of the presumption as though it were still extant; however, the impact upon the presumption of many late decisions seems to have rendered it as attenuated, for instance, as the shadow of a wraith, incapable of sustaining anything more substantial than the memory of earlier social and economic concepts.

It may be that the courts which decided the following cases would hold in favor of the validity of the Alnutt Patent: Treibacher-Chemische Werke Gesellschaft Mit Beschrankter Haftung v. Roessler & Hasslacher Chemical Co., 2 Cir., 219 F. 210; Chadeloid Chemical Co. v. Frank S. De Ronde Co., C.C., 146 F. 988; Polygon Products Corporation v. Kant-Rust Products Corporation et al., 3 Cir., 292 F. 569; Chadeloid Chemical Co. v. F. W. Thurston Co. et al., D.C., 220 F. 685. It is not clear, however, that that is necessarily true. Matheson v. Campbell, 2 Cir., 78 F. 910, is probably to the contrary and is thus expounded by Judge Lacombe in the Treibacher-Chemische case, supra, and since he wrote both opinions his comment is reproduced:

"We are satisfied that the 'equivalency' of other metals with iron is to be found, not in their chemical structure, but in their functional efficiency when combined with cerium in a metallic alloy. Cases in this circuit (Matheson v. Campbell, 3 Cir., 78 F. 910, 24 C.C.A. 384; Rickard v. DuBon, C.C., 97 F. 96; Panzl v. Battle Island Paper Co., 2 Cir., 138 F. 48, 70 C.C.A. 474) have indicated a qualification of this theory of broad equivalents. A patentee will not be allowed to maintain a claim for more than he has discovered and disclosed.

"In the first of these cases the claim was for a dyestuff as a new product. The patentee described a special process by which the product was obtained, using therein a specified sulpho acid. He stated as his discovery, invention, and disclosure that 'any sulpho acid of any radical', when treated according to the process described, would produce the dyestuff of the patent. The testimony showed that there were over 100 different substances in the group of 'sulpho acids of any radical', and that only some of them—di-sulpho acids, with which alone

the patentee had experimented—would, when treated according to the process, produce the dyestuff. The complainant contended that whenever a particular sulpho acid, not tried before, produced the dyestuff, his patent would cover it, although it did not cover sulpho acids which would not produce the result. We held that he could not thus 'speculate on the equivalents of his claimed invention, and thereby oblige the public to resort to experiment in order to determine the scope of the claim of his patent'.

"In the second case above cited the claim was for an improvement in the art of treating tobacco leaves, which consisted in 'applying an alkali to the leaves of the growing plant'. Patentee had produced his result of applying a specified alkali to the leaves; but the broad construction of the claim covering *all* alkalis was held void because it would be broader than the invention, as it would cover potash, an alkali which would not accomplish the result, and the patentee had not experimented to discover what alkalis would and what would not do so."

The evidence here which bears upon the foregoing is found in the undisputed testimony of the neutral witness Boardman that in 1938 there were on the market at least 150 different types of phenol-aldehyde resins, and that his company made 50, and all were thermoplastic, and that each had different physical and chemical properties from all others, that "we wouldn't make two alike".

It is also stated in the said Public Printer's Report for 1933 that "approximately 25 different synthetic resin mixtures have been made and their characteristics studied * * * with the aid of a stereoscopic binocular microscope * * * the results (of tests) are promising * * * but none have yet been made to combine in a single mixture all of the desirable characteristics".

This seems to resemble so closely the condition described in the above quotation from the opinion of Judge Lacombe as to render applicable his statement: "We held that he could not thus 'speculate on the equivalents of his claimed invention, and thereby oblige the public to resort to ex-

periment in order to determine the scope of the claim of his patent'."

It is claimed for Alnutt that his patent covers all resinaceous material which possesses certain physical characteristics, but only one is disclosed, and that in terms of the way to produce it.

Defendant argues that Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868, is not an authority against validity. The opinion contains (277 U.S. at page 256, 48 S.Ct. at page 479, 72 L.Ed. 868) the following:

"Thus the inventor who advances the art by discovery that a certain defined material may be combined in a product useful for certain purposes seeks to extend his monopoly to any product which may subsequently be made from materials not within any defined range described in the patent, but which is likewise useful for those purposes.

"But an inventor may not describe a particular starch glue which will perform the function of animal glue and then claim all starch glues which have those functions, or even all starch glues made with three parts of water and alkali, since starch glues may be made with three parts of water and alkali that do not have those properties."

The defendant's comment is: "The facts at bar are quite different from the above. In the Alnutt patent the claims describe each ingredient in terms of commonly used units of measurement * * *."

If "resinaceous material", as set forth in the claims or as defined in the specifications, is described "in terms of commonly used units of measurement", I have been unable to detect them. In other words, the quotation from the Holland opinion seems to be applicable to the Alnutt specification which states that the resinaceous material has been chosen with respect to its physical characteristics; it may be either a single resin or wax of natural or synthetic origin, or a mixture of two or more. It seems clear that the materials so designated do not fall within "any defined range", unless the testimony above referred to as to the number of synthetic resins is to be ignored.

The term "wax" is indeed comprehensive; it is said in the Columbia Encyclopedia:

"In general, waxes are distinguished as composed of esters of the higher alcohols and of free fatty acids."

Apparently they are of animal, plant or mineral origin, and while the second named is the source of carnauba wax used in the preparation of the synthetic resin, the making of which is described in the patent, it nowhere appears that the disclosure is intended to be restricted in that respect.

A filament for electric incandescent lamps was under examination in General Electric Co. v. Wabash Appliance Corporation et al., 304 U.S. 364, 58 S.Ct. 899, 82 L. Ed. 1402, and Claim 25 read: "25. A filament * * * composed substantially of tungsten and made up mainly of a number of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting * * *." Of this language, it was said (304 U.S. at page 371, 58 S.Ct. at page 902, 82 L.Ed. 1402): "Claim 25 vividly illustrates the vice of a description in terms of function." While it is true that Alnutt is more adroit in that he states the desirable physical characteristics, rather than the function of the substances entering into his acid resist powder, the only reason for so doing is to indicate that they must each perform a certain function in order that the powder may accomplish its purpose. This is but another way of stating what the ingredients do, instead of what they are.

There are manifest differences between the Alnutt and the Pacz patents, but it seems that the reasoning which condemns the latter is not without present cogency. Alnutt was seeking to perfect a substitute for dragon's blood in a specific field of activity. Pacz was seeking to treat tungsten so that it would perform more acceptably as a lamp filament. His 218th experiment yielded satisfactory results, and while we do not know how many experiments Alnutt made, the problem presented by the Public Printer's 1932 and 1933 reports was so clearly defined, that the trial and error process may be thought of as similar in purpose and objective. If this is so, the requirements for definitive disclosure and delimitation are comparable in the legal sense. The General Electric case is sought to be avoided on the theory that in Alnutt "each ingredient * * * is set forth definitely in terms of upper and lower limits of everyday recognized units of physical measurements, and the specification gives full particulars for compounding".

Since the size of grains was part of the claim in the cited case, "comparatively large" meant nothing. It is not that kind of lack of definition that renders this patent obscure; it is the constituency of the ingredients which lacks identification in any precise sense. If there is any testimony to the effect that the defendant's powder as described in the specification cannot be stated in the terms of a chemical formula, it has evaded my search. The nearest approach seems to be a statement to the effect that it has not been done, and that chemical analysis of this and of plaintiff's competing powders is difficult; but as to the latter, a microscopic physical analysis is substantially accurate, and in general accord with the formula of manufacture.

Whether the patent was cast in the chosen form because no chemical formula was available, or because it was desired to confine its terms to physical characteristics which might reside in 100 or so synthetic resins and thus render them all inaccessible to competitive adaptation, is a subject which invites reflection. If the latter be suggested as the probable theory of draftsmanship, at least the inference is permissible.

An instance of claims which are specific enough to indicate the elements of a composition having a definite office, but not stated in the terms of a chemical formula, will be found in Re West, Cust. & Pat. App., 160 F.2d 570.

It is not an agreeable task to deny validity to this patent, for it denotes a distinct contribution to the photo-engraving process, and the defendant's product has had a wide acceptance in the trade since it first came upon the market in 1935. The testimony stands undisputed that 75% of the plants in this country have come to employ the powder of the Alnutt patent, and since the problem which it was largely suc-

cessful in solving was well known as appears from the Public Printer's Reports, and had been recognized for a number of years, the nature of Alnutt's contribution to the art seems to meet that which was said in Safety Car Heating & Lighting Co., Inc., v. General Electric Co. et al., 2 Cir., 155 F.2d 937, at page 939 (1st column).

It is not the absence of invention, but the indefinitely sweeping and comprehensive scope which is claimed for it, which is thought to stand in the way of according validity to the patent.

Other contentions urged in this connection do not require extended comment.

Hunt's No. 160 was a dragon's blood acid resist powder, put upon the market in 1933. It is thought not to constitute a prior use, since Alnutt's teaching is against its inclusion, as has been seen.

Defendant's 1935 Sales:

This subject is not so easily disposed of. It has to do with defendant's sales stipulated to have been made in October of 1935, prior by six months to the filing date of the first Alnutt Application (Serial No. 72,061) of April 1, 1936. That was not continued as such after final rejection of November 16, 1937, for insufficiency of disclosure. There was no appeal to the Board of Appeals; nor was action taken pursuant to 35 U.S.C.A. § 63, by the filing of a bill in Court. Thus by May 16, 1938, the Application would have been deemed abandoned upon failure to prosecute, 35 U.S.C.A. § 37, since no shorter time was specified in the Examiner's letter of November 27, 1937, refusing to enter the amendment dated five days earlier.

On May 9, 1938, the present Application was filed, which states that it is a continuation in part of the earlier one. Such was the Patent Office recommendation of November 16, 1937, rejecting all claims of Serial No. 72,061.

If this Application then is entitled to the filing date of the prior one, April 1, 1936, the sales were not made in contravention of 35 U.S.C.A. § 31 (which in 1938 fixed a two-year period of public use), while if May 8, 1938, is the controlling date, the contrary result ensues.

The second Application seems to fall within the definition of a continuing application as laid down by the Commissioner in Ex parte Hall, 277 O.G. 395: "A continuing application is an application filed subsequently to another application, while the prior application is pending, disclosing all or a substantial part of the subject-matter of the prior application and containing claims to subject-matter common to both applications, both applications being filed by the same inventor or his legal representative. Defining it in a simpler way, a continuing application is a development of an applicant's earlier application and which is entitled to the filing date of his earlier application for a constructive reduction to practice of the common embodiment of his invention in the two applications."

The above had to do with reduction to practice, but the defendant is equally protected as to public use. See Godfrey v. Eames, 68 U.S. 317, 17 L.Ed. 684.

That which was continued was the Application as contained in Plaintiff's Exhibit 3, which seems to have been carried over into Exhibit 4, although a word for word comparison has not been made. The latter contains the added description in the specification of the way to make the particular synthetic resin which is disclosed.

 What has been accomplished is in effect an amendment to the original Application, although why it was not done in that guise has not been explained; however, since the earlier date would have been available if the solicitation had been so conducted, the only objection to a computation of the public use period as at April 1, 1937, is that the grant of the second Application dates the commencement of the patent term according to the second Application, which was granted. This subject is discussed in the dissenting opinions in Harder et al. v. Hayward, 150 F.2d 256, at page 261 et seq., 32 C.C.P.A.(Patents) 1051, under a different state of facts. The practice seems to be approved in the Patent Office, and was recommended by the Examiner in connection with his rejection of the first Application, and for that reason, more than because it seems in the public interest, I feel constrained to hold

that the defendant is entitled to rely upon the filing date of the first Application so as to exclude the sales in October of 1935 as public use which would be fatal to the Patent.

The plaintiff cites Whittier v. Borchardt, 154 F.2d 522, 33 C.C.P.A.(Patents) 1023, but it is distinguishable because there the primary Examiner did not suggest the continuance in part, as in this case. There is something repugnant to ordinary concepts of fair play, to penalize a patentee for doing that which the Office suggested, and later sanctioned. Probably there was no appeal from the rejection of the earlier Application here, because the patentee was advised that the Examiner was clearly right and that his rejection of the Application for failure of disclosure would probably be upheld.

It seems unnecessary to discuss much that has been written by both sides touching the correctness of the Examiner's first decision, in view of the various Notices issued by the Commissioner of Patents touching the use of "registered trade-marks in specifications as common descriptive nouns", dated respectively April 25, 1934, February 12, 1935, and July 28, 1936.

It seems pretty clear that "Durez S-5758" as a trade-name is so far removed from "Kodak" and "Cellophane" in the matter of public understanding, that there is nothing to support the argument that the Examiner's rejection was improper.

Defendant relies upon In re Gebauer-Fuelnegg et al., 121 F.2d 505, 28 C.C.P.A. (Patents) 1359, but it seems that the distinction between the extent of the disclosure concerning "Plioform" and "Pliolite" on the one hand, and "Durez S-5758" on the other, sufficiently appears in the following language of the opinion, 121 F.2d at page 508: "It may be that with the substituted specification—explaining in detail the method of making 'pliolite'—it would be easier for one skilled in the art to practice appellants' invention."

If there is a comparable explanation in this specification of how to make "Durez S-5758", it has eluded my scrutiny.

To conclude this branch of the case, it should be observed that so much of Al-nutt's Patent as might have been accorded validity is the composition containing precise synthetic resin which he tells how to make, and the other ingredients disclosed, in the proportions stated; to do that, however, would be to rewrite the patent, and to defeat its very apparent purpose, which was to exclude others from using any synthetic resin or wax whatever in the compounding of an acid resist powder. Since that was the patentee's choice, he must abide the consequences.

It is concluded that the Alnutt Patent is invalid for the reasons which it has been the effort to explain.

Infringement:

By reason of what has been written, little need be said as to infringement, except upon the theory that I am mistaken concerning validity.

As to the burden of proof in a declaratory judgment case, the pleadings should be consulted (Bauer v. Clark, 7 Cir., 161 F.2d 397, at page 400) to ascertain which of the parties would suffer an adverse judgment, if no evidence were to be received. The complaint asserts lack of validity of the Alnutt Patent, lack of infringement, and defendant's intention to sue plaintiff's customers for infringement. Defendant alleges that it has the right to sue said customers, but denies that "defendant plans now to file such suits".

The answer contains a counterclaim alleging infringement, among other things, and that is denied in a Reply. It would be incumbent upon defendant to offer testimony to substantiate its allegations of infringement; failing which, it could not recover the decree which it seeks.

It follows that the burden of proof upon such issue rests with it. This seems to accord with the views of Professor Borchard (Borchard's Declaratory Judgments, 1941, page 404):

"Burden of Proof

"Since as a rule the risk of non-persuasion is on the plaintiff, it is not surprising to find that the burden of proof in declaratory actions rests, in the vast majority of cases, on the moving party. Yet, as we shall see, the peculiar nature of the suit for a declaration of non-liability may shift

874

that burden to the defendant, the party who originally made the charge or claim, such as patent infringement, which is the basis of the action for a declaration of non-liability. * * *."

To be specific then as to what was required of the defendant in establishing infringement, and adopting its theory of the patent, the defendant was required to persuade the Court:

That the synthetic resins used in the plaintiff's powders Nos. 89, 99, and 44 possessed the 9 physical characteristics listed on page 2, column 1, lines 1 to 20, of the patent.

The testimony falls short of this requirement.

Kelt deposes (S.M. p. 456) as to these powders: "They resemble the working properties of Mallinckrodt etching powders and not dragon's blood."

Grosvenor states the results of his physical analyses and at page 508: "I found the adhesion powder to consist of quartz." But he fails to demonstrate that quartz possesses the physical properties ascribed to the "adhesion powder" at page 3, column 1, line 60 et seq. of the patent. At page 625 he says he can refer to no text-book or publication which mentions quartz as an adhesive powder.

At page 528 he refers to the "shrink point" of the plaintiff's resins, and at page 549 to the "softening point"; the other functional aptitudes ascribed to the resin disclosed by the patentee are not the subject of testimony.

The presence of quartz in the plaintiff's product is not within the teaching of the Alnutt Patent, and there seems to be no argument to the contrary. The proportions of the several ingredients are not shown in reference to all of them to be the same as in the defendant's products, and it is a reasonable inference that these differences may play a part in the resemblance in performance stated by Kelt, since it appears that the synthetic resins used by plaintiff are different in chemical constituency from those referred to in the patent.

It is therefore held that the defendant has failed to sustain the burden of proving infringement.

In view of all the circumstances involved in this litigation, it is not deemed to be a case calling for the award of counsel fees to either side; nor do I think that the defendant has been guilty of laches.

Judgment will be ordered for plaintiff, and Findings are filed herewith.

This cause came on for trial commencing on February 27, 1947, and briefs were filed by April 18, 1947; and the Court, having heard the evidence and counsel for the respective parties, finds the facts and states the conclusions of law as follows:

### Findings of Fact.

1. Plaintiff is a corporation organized and existing under the laws of the State of New York.

2. Defendant is a corporation organized and existing under the laws of the State of Missouri.

3. The subject-matter in controversy in the complaint exceeds the sum of $3,000, exclusive of interest and costs.

4. Letters Patent of the United States of America No. 2,168,756, hereinafter designated as the Alnutt Patent, were issued to defendant on August 8, 1939.

5. Since August 8, 1939, defendant has owned the entire right, title and interest in and to the Alnutt Patent.

6. Subsequent to August 8, 1939, defendant has charged that plaintiff has infringed the Alnutt Patent.

7. Prior to the filing of the complaint, a controversy existed between the parties as to the validity and infringement of the Alnutt Patent.

8. At the trial, defendant has charged plaintiff with infringement of Claims 1-6, inclusive, and Claim 9 of the Alnutt Patent.

9. The accused powders sold by plaintiff are identified as Hunt powders Nos. 89, 99, and 44.

10. Plaintiff has made and sold said accused powders in the United States of America, subsequent to August 8, 1939, and prior to the filing of the complaint herein.

11. The composition of the accused powder No. 89 is stated in Plaintiff's Exhibit No. 25.

12. The composition of the accused powder No. 99 is stated in Plaintiff's Exhibit No. 26.

13. The composition of the accused powder No. 44 is stated in Plaintiff's Exhibit No. 27.

14. The composition of the accused powders has not included "adhesion powder" according to the classification and definition of "adhesion powder" in the Alnutt Patent.

15. Mica, talc, and graphite are "lubricant powders", according to the definition and classification of "lubricant powder" in the Alnutt Patent.

16. The maximum range of variation of the proportions stated in the claims in issue is 5% of each stated proportion.

17. Each of the three accused powders has more than 7.35% of talc.

18. Graphite is a lubricant powder, and the accused composition No. 44, identified by Plaintiff's Exhibit 27, has more than 14% of lubricant powder.

19. The resinaceous material used in the accused powders Nos. 89 and 99, identified by Plaintiff's Exhibits Nos. 25 and 26, is different in chemical constituency from the resinaceous material disclosed in the Alnutt Patent.

20. The major proportion of the resinaceous material used in the accused powder No. 44, identified by Plaintiff's Exhibit No. 27, is different in chemical constituency from the resinaceous material disclosed in the Alnutt Patent.

21. In making its accused powders, plaintiff has intermixed all the non-resinous ingredients thereof with the molten resin, with the exception of a part of the mica used in said powders.

22. Defendant has made and sold etching powders made according to the disclosure of said Alnutt Patent, in the United States of America, beginning in October, 1935.

Conclusions of Law.

1. The claims in issue are void because they are broader than any alleged invention of Alnutt and because said claims are indefinite and functional.

2. The burden of proof was upon defendant to establish infringement, and defendant has not met such burden.

3. That judgment be entered, dismissing the counterclaim on the merits, and declaring that Claims 1-6, inclusive, and Claim 9 of said Alnutt Patent are void and non-infringed, and enjoining defendant from asserting such claimed infringement against plaintiff and the persons handling or using plaintiff's accused powders.

It is so ordered, and counsel for plaintiff will submit appropriate judgment in accordance therewith.