**AMERICAN CUTTING ALLOYS, Inc. v. CARBOLOY CO., Inc.**

No. 5073.

United States District Court
E. D. Michigan, S. D.

Sept. 24, 1948.

Owen & Owen, of Toledo, Ohio, Joseph O. Ollier, of New York City, and Carl F. Schaffer, of Toledo, Ohio, and Arthur W. Dickey, of Harness, Dickey & Pierce, all of Detroit, Mich., for plaintiff.

Dickinson, Wright, Davis, McKean & Cudlip, of Detroit, Mich., Watson, Bristol, Johnson & Leavenworth, of New York City, Arthur Raisch, of Detroit, Mich., and Abraham Cohen, of Schnectady, N. Y., for defendant.

PICARD, District Judge.

This case is concerned with development of carbides as cutting tools, passing through innumerable stages and alleged advances in the art from about 1916 to the present day. That progress generated from the old axiom and accepted maxim that such a tool must be harder than the material it is to cut.

Carbides as tools came into use in World War I when Germany could not obtain industrial diamonds. High speed steels and stellites would cut cast iron and other ferrous and nonferrous materials. Various uses of carbides followed and then came the Schroter cemented carbide, invented in 1923, but not commercially successful until 1928. Steels and stellites were cast. Schroter's tool was a pressed sintered product and the last word in cutting tools. (See Appendix A on meaning of terms.)

A carbide is a chemical combination of one element from the 3rd, 4th, 5th or 6th group of what is known as "the periodic arrangement of the elements" (See Appendix B) reacted with carbon, forming a molecule. Only the hard, refractory metals are acceptable; for example, from the 3rd group, boron; from the 4th, silicon, titanium, zirconium; from the 5th, columbium, vanadium, tantalum; and from the 6th group, molybdenum and tungsten.

To obtain tungsten carbide, one atom of tungsten (W) is reacted with one atom of carbon (C) to form a molecule (WC), or in another form two atoms of tungsten ($W_2$) reacted with one atom of carbon (C) forms a molecule ($W_2C$).

As the newer, harder, tougher alloy steels came into being and the revolving speed of machines was increased, carbide tools were much limited in their use, until the Schroter patents, developed throughout the 1920's, indicated that if you comminuted the carbide formed, as above explained, and sintered or heated it with a powdered element of the 8th group of the periodic arrangement, to-wit iron (Fe), cobalt (Co), or nickel (Ni), the element from the 8th group would act as a binder or cementer. This carbide so cemented proved itself the superior cutting and abrading metal for most tool purposes produced up to that time. It was found that the carbide gave the composition hardness, while the binder metal added the toughness and strength required.

Later it was also learned that with the further increase in machine speed and hardness of steel the utility of even the so-called cemented tungsten carbide tool was greatly minimized for many purposes, and

scientists and metallurgists made numerous attempts to bridge the gap, which, plaintiff claims, finally resulted in its (Schwarzkopf's) composition (Patent 22,207) a multicarbide product and which, plaintiff further contends, was an entirely new method of making multicarbide tools by

1. forming substantially solid solutions of said structure by mixing at least two different carbides from the hard refractory metal secured from the 3rd, 4th, 5th and 6th group of the periodic system, heat treating the mixture at a temperature of between 1600° and 2000° C;

2. intimately mixing the mass so obtained and auxiliary binder metal in a powdery state; and

3. sintering this mixture at elevated temperature up to about 1400° to 1600° C, considerably lower than the melting point of the hard refractory carbides and higher than that of the cementing metal.

### The Questions.

The issues deal with plaintiff's (Schwarzkopf's) patents:

22,207 which describes the method of producing the hard metal composition for the tool;

22,074 known as the "final forming patent;"

22,166 a product patent for a three-carbide tool;

and 22,073 product patent for a two-carbide tool.

Plaintiff contends that 22,207 is infringed by the method used in making defendant's grades 78, 78B, 78C, G78B and 831;

that its three-carbide patent 22,166 is infringed by defendant's grades 78, 78B and 78C;

its two-carbide patent 22,073 infringed by defendant's grades 831 and G78B;

and that 22,074, the final forming patent, is infringed by defendant's method of making its grades 78, 78B and 78C.

Plaintiff does not claim that a tool produced by using a single carbide, such as tungsten or titanium cemented by cobalt, iron or nickel, infringes either of its method patents or its product patents. Nor

does it contend that Schwarzkopf, its inventor, was the first man to use multicarbides. Its position is simply this—that Schwarzkopf was the first to "preform" the mixture of multicarbides—that is more than one—to form crystal structures of at least two different elements into solid solution. That then and not until then (22,207) was this mixture or solid solution comminuted, mixed with the cementing powder and finally sintered to obtain the completed product. It also contends that whenever multicarbides are formed into solid solution before adding the cementing material (22,207) or in the sintering step with cobalt (22,074), the user infringes on these two patent rights.

Its claims of infringement on patents 22,166 and 22,073 go to the product.

The important issue to keep in mind is the claim of Schwarzkopf that his invention made a decided, inventable improvement in the resulting composition for cutting tools, in hardness, toughness and strength; that this was true because there was a "preforming" resulting in a solid solution or mixed crystals; and that his use of multicarbides for "preforming" furnished the "flash of creative genius" required of an invention. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed 58.

Defendant claims that all four patents are invalid and, whether valid or invalid, denies that any one of its several grades infringes any of plaintiff patents.

### Opinion.

We make no attempt here to separate findings of facts from conclusions of law. We simply observe that much evidence was taken, the greater part of which was very technical, and we have attempted to separate the wheat from the chaff. This is particularly necessary in this case because throughout the hearings, arguments and briefs the parties stressed and minimized the significance of alleged differences in both the methods and the products. For example, where the degrees of sintering differ, or where the specific percentage of the ingredients may vary, each party,

at times, held such differences to be important and at other times not important. Another example is where the plaintiff insists that the abandoned Balke U. S. application Ser. No. 498,758, filed in November, 1930, can be of no help to the British patent 376,256 owned by Balke's Company, but the Schwarzkopf abandoned U. S. application filed in May, 1930, should be of conclusive aid to establish a prior date for 22,207. Defendant argues to the contrary. At another point plaintiff emphasizes the exactness of words in its own claims but minimizes them in those upon which defendant relies. This is particularly true in its reference to the Schroter patent of June 10, 1929, where Schroter uses the word "carbides." Plaintiff reasons that the patent couldn't possibly be read to mean the plural. At another point plaintiff maintains that the Fetkenheuer Patent 1,910,532 (August 21, 1931) shouldn't have the benefit of the solid solution although solid solutions were formed. So while plaintiff applies Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 447, 55 L.Ed. 527, to its benefit, here it denies that benefit to the Liebmann U. S. 1,343,976, Schroter U. S. 1,757,846, Fetkenheuer U. S. 1,910,532 patents and others. Briefly the Diamond Rubber case, supra, held that

"It is certainly not necessary that he (the inventor) understand or be able to state the scientific principles underlying his invention." (Words in parenthesis ours.)

It has been the aim of this court to attempt to sift all these claims and counterclaims and to determine an objective through the maze that is consistent with equity and justice, giving to the parties their respective rights, cognizant that a patent having been granted by the Patent Office, carries a presumption of validity and that the burden of proof to upset that presumption rests upon the person advocating invalidity. W-R Co. v. Sova, 6 Cir., 106 F.2d 478. This court also accepts, throughout this opinion, the recognized rule that a patent must present novel features, National Hollow Brake-Beam Co. v. Inter-

changeable Brake-Beam Co., 8 Cir., 106 F. 693; that it must be useful and have commercial value, Walker on Patents, Vol. I, Sec. 71, p. 322 (Deller Ed.); and that there must exist the "flash of creative genius," in the patented article, process or method, Cuno Engineering Corp. v. Automatic Devices Corp., supra.

### The Prior Art.

As to whether these inventions were something new, it is advisable to first look into the prior art to see just what had been accomplished by earlier workers. And, strange as it may seem, the resulting presence of a "solid solution" upon which plaintiff predicates its entire claims was apparently used early in the development of cutting tools for the Voigtlander and Lohmann (German) patent 295,726, filed May 17, 1914, issued December 14, 1916, took tungsten and molybdenum carbides, or a mixture of these carbides, powdered, pressed into molds, and heated them to about 2200° C. This formed a solid solution or mixed crystals. (Plaintiff's brief 86) But Voigtlander and Lohmann used no cementing substance.

Then the Liebmann patent 1,343,976, issued in June, 1920, disclosed a product that resulted from heat treating of 92 per cent tungsten, 6 per cent iron, $\frac{1}{4}$ per cent carbon, and $1\frac{3}{4}$ per cent titanium oxide. There is no statement in the patent that there was such a mixture as a solid solution, even though the patent also provided for the mixing of titanium and tungsten, two metals which when treated properly would form a solid solution or mixed crystals. It is well to note that Liebmann refers rather vaguely to the word "carbides," (more than one), and also that we have the element of iron as part of the finished tool. Whether a solid solution or mixed crystals was formed does not appear, but witness Redmond admitted that in Kennametal, Inc., v. American Cutting Alloys, Inc., D.C.Del. 1948, 77 F.Supp. 136, Prof. Norton had testified that he found no evidence of such. With this Redmond did not agree.

The Schroter patent 1,549,615, filed October 31, 1923, issued August 11, 1925, pro-

vided for the mixing of tungsten carbide, with an auxiliary metal in a sintering process. There was no solid solution because there was only one carbide. This was true of Schroter's 1,721,416 patent (U. S. April 26, 1926-German May 7, 1925), which was merely an improvement on the prior Schroter patent in the amount of cobalt used as a binder.

The Schroter patent 1,757,846, applied for June 10, 1929, in this country, and in Germany June 15, 1928, was issued here in 1920. This third Schroter patent, when gauged by today's developments and knowledge, might vaguely suggest the same process as described in plaintiff's 22,207, but considered in the light of information then available, added to the fact that patents of this same nature were crowding the prior art without a single one using multicarbides being of known commercial value, force us to conclude that there is nothing in the Schroter third patent claims indicating that Schroter was aware of the efficacy of heat treating multicarbides so that they would form a solid solution or crystals before cobalt was added. But here again the significance of the Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., supra, decision might well be considered.

One can anticipate that all these men and others were at least groping near the edge of discovery, for at that time many scientists, including Schwarzkopf and General Electric—parent company of defendant—were experimenting with multicarbides. However, none of their experiments with multicarbides was commercially successful up to that time.

By 1929 therefore we have

(a) 1916—the Voigtlander-Lohmann patent resulting in a solid solution of mixed carbides—no cobalt;

(b) 1920—Liebmann's heating at temperatures to white heat of tungsten metal, carbon, titanium oxide, and iron—no statement of solid solution;

(c) 1923—Schroter's single carbide using cobalt as a binder;

(d) 1924—German patent 401,600 showing the use of a plurality of carbides but fusing and casting the product, with a reference to solid solutions or mixed crystals—again no cobalt (defendant's Exhibit 17Q); and

(e) 1929—Schroter's third patent vaguely suggesting multicarbides but not clearly so. (Note this statement becomes more important because of the ruling on plaintiff's German and U. S. applications that are more specific on this feature than Schroter but which were ruled out as we will hereinlater cover.)

We come then to the May 16, 1929, Schwarzkopf application in Germany that, so far as we can see, was the first petition where the claims provided directly for carbides to be formed in solid solution. Undoubtedly if the specifications of the third Schroter patent had been carried out, a solid solution would have been obtained when multicarbides were heat treated, and there may have been some solid solution back in the early experiments with the Liebmann patent. But the Schwarzkopf application filed in Germany in 1929, followed by an identical application in this country May 13, 1930, serial 452,132, unquestionably discussed solid solutions in their claims. In November 1931, Schwarzkopf and Hirschl applied for patent U. S. 1,925,910 which also covered solid solutions, and on July 27, 1932, while Schwarzkopf's serial 452,132 was still pending, Schwarzkopf made application for patent, 2,091,017. Then on February 10, 1933, while the U. S. application based on the German application, and Schwarzkopf's July 27, 1932, application were still pending, the patent that is referred to in this suit as the "preforming patent," to-wit, 22,207 was filed.

Up to July 27, 1932, when patent 2,091,017 was applied for, still no one in our opinion had hit directly upon the efficacy of the preforming of solid solutions as the preliminary step for obtaining a good substance as provided therein and carried into method patent 22,207 filed February 10, 1933. We believe that the plaintiff is entitled to that prior date of July 27, 1932, insofar as 22,207 is concerned, but the extent of its coverage, and whether it has as broad a scope over solid solutions as claimed by plaintiff, we will discuss later.

472

## Plaintiff's Right to Prior Date for 22,207.

In the meantime we examine plaintiff's claimed rights to an earlier effective date (Plaintiff's Brief 9, 10, 11, 12). We will discuss these seriatim.

■ Plaintiff reasons that it has the right to show by proof (admitted at the trial so the record might be complete) evidence of experiments conducted in Austria by Schwarzkopf even before the first German patent was filed in that country. We were not overly impressed with this evidence even if admissible because it is doubtful if any scientist or metallurgist who was considering the question of hard carbide tools at that time would not be able today to produce some records of experimentation with what has developed now to be a rather good answer to the question. But we also believe that this proof should not have been admitted for two reasons, first it was uncorroborated and, second, it was barred under Section 9 of the Act of August 8, 1946, 35 U.S.C.A. § 109, which states:

"In proceedings * * * in the courts of the United States * * * patentee, shall not be permitted to establish the date of invention or discovery by reference to knowledge or use thereof, or other activity with respect thereto, in a country foreign to the United States, other than the filing in a foreign country of an application for a patent for the same invention, discovery, or design * * *."

■ Congress has the right to control the courts and the manner in which proof may be admitted. Bateman v. Ford Motor Co., D.C., 76 F.Supp. 178.

True, Section 15 of that Act, 35 U.S.C.A. § 114, does specifically state that nothing contained in the Act "shall be effective to nullify *any judicial finding* upon the validity of any patent for an invention, discovery, or a design made before August 8, 1946, by a court of competent jurisdiction." (Emphasis ours)

■ But up to that time there had been no "judicial finding" and our attention has not been directed to any case that indicates that a patent without judicial find-ing is a "vested right" that would take precedence over an act of Congress.

## German (1929) and U. S. (1930) Application

Secondly, plaintiff claims that it should have the benefit of the application that was filed in Germany in 1929. This is the identical application for patent filed in this country May 13, 1930, under serial 452,132 and both of which patents were the subject of many hearings and discussions before the Patent Office for the greater part of eight years. The Patent Office finally ruled that under R.S. § 4888, 35 U. S.C.A. § 33:

"The specification fails to describe the invention and discovery * * * as required by statute."

"Such is considered a fatal lack of disclosure."

"Claims 1 to 14 are rejected for fatal lack of disclosure in the specification."

Numerous attempts were made by applicant to remedy the defects but on October 28, 1931, the Patent Office again said "* * * both the added material and the claims are not warranted by the original disclosure."

And when Schwarzkopf tried to alter the Patent Office's decisions by reference to the German application, the examiner in the prosecution for patent 2,091,017 stated:

"Accordingly, it is considered to be clear that applicant is not entitled to the filing date of the earlier filed application (Ser. No. 452,132 filed May 13, 1930) for the subject matter of the appealed claims. * * *"

Still later the Board of Appeals stated:

"It is our view that neither the prior application, Serial No. 452,132 nor the German application filed May 16, 1929, will support the counts and they cannot be depended upon by Schwarzkopf to establish any prior date."

Throughout the thirties then, we find the Patent Office, its examiners and the Board of Appeals all ruling against these prior applications because they were indefinite, obscure, and did not adequately relate the

method by which the product was supposedly made.

Admittedly the courts have held that where the Patent Office grants a patent on a succeeding application it waives its right to enforce res judicata of a prior rejection of an earlier equal application (Overland Motor Co. v. Packard Motor Co., 274 U.S. 417, 47 S.Ct. 672, 71 L.Ed. 1131.) but here the early case was of insufficient disclosure and was abandoned. So evidently the Patent Office felt that without enumerating the method by which these carbide tools were formed, in view of the confused and uncertain state of this particular field, no one should have a patent unless it was made so specific that what the applicant had invented fully appeared. Surely patentee's right to carry over from an abandoned patent application does not extend to matters or important details that are not apparent therein, particularly where a patent is denied for that very reason.

This brings us to the Schwarzkopf application of July 27, 1932, being patent 2,-091,017, which is an earlier date than 22,-207, claimed by plaintiff, and to this court it appears that claims 16 and 18 met many of the objections advanced by the Patent Office to 452,132, the United States abandoned patent and the German application..

One of the specifications provide:

"Any suitable known method may be used for the production of mixed crystals, more especially the carbides, e. g., of tungsten and molybdenum, can be suitably comminuted, mixed and heated up to 1,600 to 2,000° C for about 1 to 2 hours until mixed crystals are formed, which latter are then mixed with the additional metal in powdered form, and the whole is moulded and sintered at a temperature of about 1,400 to 1,600° C."

This is practically the exact manner detailed by plaintiff in getting results by its method set forth in 22,207, and if 22,207 is a valid patent it should have the benefits of the earlier date, to-wit July 27, 1932.

## Extent of 22,207 Coverage.

But just what did Schwarzkopf invent, and do any or all of defendant's several grades infringe any of these four patents, starting with 22,207?

Turning to defendant's grade 831, we find that the substance from which this grade is made is known as 4A. Substance 4A has the alternative of starting with either a metal, an oxide and a carbon, forming the carbide, or with a carbide. This is heated to 2100°–2200° C. No other carbide is added to the solid solution obtained before cobalt is admixed. Then follows the final sintering at 1400°–1500° C. The very first step that substance 4A takes is a preforming of carbides into solid solution. True, defendant employs a heating that is 2100° to 2200° C, while 22,207 has a maximum of 2000° C. But we cannot say that this should defeat the proper rights of the patentee, particularly when in manufacturing grade 831 the exact steps are taken in stages to obtain the exact product that is provided for by the method of producing a hard metal composition as indicated in the bridging patent filed July 27, 1932, and carried over into 22,207. General Electric Co. v. Continental Fibre Co., 2 Cir., 256 F. 660.

It is also well to note that defendant started experimenting with its grade 831 in 1932, and only after Schwarzkopf had demonstrated the possibilities of multicarbides at defendant's Schenectady plant. Defendant actually tried making grade 831 without a preforming of solid solutions, and up to 1935 it was not fully successful. It then adopted the Schwarzkopf method.

However, when we analyze G78B we find that before the product is obtained, and after the solid solution is formed, another carbide is added with the cobalt. Grade G78B does not follow the formula laid down in 22,207. True, it gets a solid solution before the adhesive cobalt is added, but that isn't all it does. When it comminutes the solid solution consisting of 65.6 per cent tungsten carbide (WC) and 34.4 per cent titanium carbide (TiC), it adds another 67 per cent of tungsten carbide along with the cobalt. This, in our opinion, is as distinct a method of getting the tool desired as the preforming of two carbides was in the first place. Certainly if preforming was important, then the addition of a substance or an element that results in a tool that has 82 per cent tungsten carbide, 8 per cent titanium carbide, and 10

per cent cobalt, in the finished product, with most of the carbide not in solid solution at all, is entitled to a niche all its own in the method of making cutting tools. And if the Schwarzkopf 22,207 is such an improvement over the Voigtlander, Liebmann and Schroter patents as to rise to the dignity of the "flash of creative genius" warranting a patent, certainly a product that adds another carbide or more of one of the original carbides used in the preforming in a substantial amount at the same time that the cobalt is added, cannot infringe. In fact, one of Schwarzkopf's statements to the Patent Office (see specifications of Bridging Patent 2,091,017) emphasized that the carbides "are obtained *entirely* in the form of mixed crystals." (Emphasis ours)

### The Solid Solution.

But plaintiff's contention on the use of solid solution is unlimited. It admittedly and frankly claims that any time a solid solution is obtained, either before or after adding cobalt, anyone using that solid solution in any way to get a cutting tool substance infringes upon either patent 22,207 or 22,074.

Schwarzkopf didn't invent the solid solution. The solid solution comes as a result of properties in the elements themselves. What Schwarzkopf did in 22,207 is to outline a method by which material for a very good cutting tool could be obtained. But his is a narrow field. When a nonlicensee follows that same procedure he infringes—but not because he made a solid solution. If this were true, Schwarzkopf infringed on Voigtlander when he made a solid solution and also on Schroter when he used a cementing material.

Incidentally in General Electric Co. v. Willey's Carbide Tool Co., D.C., 33 F. Supp. 969, Judge Tuttle held in effect that Schroter made no patentable invention in adding a binder metal to an old carbide material to produce his new cemented carbide tool. It must follow, a fortiori, that Schwarzkopf can have no valid patents to cover broadly every similar addition of cobalt to an old multicarbide composition, however made.

Furthermore, it was never guaranteed that an inventor could grasp the benefits of the heat treating of two materials and say that from now on anyone who gets a substance that includes a solid solution by so doing will not be able to use that substance without infringing upon his patent. The patent laws and their interpretation do not anticipate that an inventor can usurp unto himself all the benefits of God's creative powers, and shut out everybody else from their use.

It should be noted also that the generality of all the Schwarzkopf patent disclosures prevents any conclusion that he was the first to discover special product utility in the particular carbide mixtures of tungsten and titanium, or tungsten, titanium and tantalum as compared with any of the other possible combinations of elements of the 3rd to 6th group of the periodic table.

It is, therefore, the holding of this court that patent 22,207 is valid within the narrow field designated by that patent. We hold so because we believe that plaintiff took a new combination of the old art and obtained a more efficient result. But to give Schwarzkopf or any one else a monopoly or control over the use of all the elements of the 3rd, 4th, 5th and 6th groups of the periodic system, would go far and away beyond the bounds of vested rights that any patentee could or should have. Such a holding would stymie all further inventions or improvements on cutting tools, and certainly progress that was made between the first and second world wars, greatly adding to the efficiency of tool cutting, could never be duplicated in a like future period. The patent laws are aimed to reward those who contribute to the national good and welfare. It gives them certain protection for the children of their brains. But the government does not and should not turn over to any inventor the vast, yet unexplored fields of science, or medicine, or any other phase of our economic life, thus discouraging further progress without payment of tribute to some individual. We believe, however, that we are justified in holding that 22,207 is val-

id because it meets all the requirements of patentability; that Schwarzkopf was the first man to see that a solid solution obtained by the preheating of carbides before he comminuted the substance and admixed just that substance with the cementing material, produced an excellent substance for manufacturing a high grade cutting tool.

And we hold further that defendant's grade 831 does infringe 22,207, but *defendant's grade G78B does not*. We hold that 831 infringes 22,207 because therein the solid solution of carbides is formed before the addition of the cobalt, even though the procedure 4A starts out with a tungsten metal and a titanium oxide plus carbon; 4B starts out with a tungsten metal, titanium carbide plus carbon; 4C starts out with a tungsten metal, titanium oxide, titanium carbide and carbon; in all cases adding just the resultant substance and cobalt to make the final tool product. In other words 831 follows the method outlined in 22,207; G78B does not.

Defendant's grades 78, 78B and 78C made by a method similar to G78B are found not to infringe for the same reasons. The history of the proceedings of 22,207 in the Patent Office clearly reinforce the conclusion—that defendant, in making its grades 78, 78B, 78C and G78B (all with considerably less than 50 per cent of carbide solid solutions) has substantially departed from the patent and has clearly stayed outside any valid scope which could be reasonably accorded its claims.

## Patent 22,166

We come now to 22,166 or the three-carbide (product) patent. We can see nothing in the claims that would indicate that the method used is the same as patent 22,207, but the record (p. 1450) and plaintiff's brief (pp 20, 36 and 71) so state, and with this defendant evidently agrees. It is alleged that 22,166 is infringed by defendant's grades 78, 78B and 78C. Grade 78 does not comminute and mix the solid solution alone with cobalt, but it comminutes the solid solution and then adds 52 to 53 per cent of tungsten carbide (WC), 4 or 5 per cent of tantalum carbide (TaC), and 10 per cent cobalt (Co), then comminutes, mixes,

presses to shape and presinters the entire substance so obtained at 400° to 750° C before the final sinter at 1400° to 1500° C. It neither follows the method of 22,207, nor is the product the same. And if certain desirable properties result, as claimed by defendant, for this method of obtaining a cutting tool, how has it infringed plaintiff's method that is different, or its product that does not contain the same elements—remembering always that it is the process by which the final product is obtained that may infringe 22,207, and the product that may infringe 22,166?

Grade 78B adds to the comminuted solid solution, tungsten carbide and tantalum carbide with cobalt, also comminuted. Grade 78C adds tungsten carbide, tantalum carbide and cobalt to the comminuted solid solution, and thus is neither the method nor the product the same. Attention is directed specifically to the fact that it is always a substantial amount of carbide added to the comminuted solid solution—not a small portion as circumvention.

It is interesting at this point to select as a typical claim allegedly infringed by defendant, claim 1 of 22,166, which reads as follows:

"A cemented hard metal composition sintered by heat treatment, consisting substantially of auxiliary metal essentially of the iron group in an amount of about 3% to 25% by weight, and a hard and refractory crystalline carbide substance of at least three elements selected from the third through sixth group of the periodic system, a substantial amount of said carbide substance forming homogeneous carbide crystal structures each containing atoms of different selected elements from said groups in addition to carbon atoms."

Just how the metal composition is made is not explained and if plaintiff's contention is correct it covers the entire 3rd, 4th, 5th and 6th groups of the periodic system. In that group for example is uranium—the possibilities and wonders of which are evidently beyond the knowledge of great scientists of today; yet plaintiff wants complete control of those elements, at least in the field of cutting tools and substances.

This prompts this court to add that what we have hertofore said about the rights of a patentee to control of the elements is particularly applicable to 22,166, as well as the other patents, with the exception of 22,207 where we have permitted the patent to stand and held to be infringed by defendant's grade 831.

We therefore believe that all the claims of 22,166 allegedly infringed are too vague in method and too general in their scope; and while we are not passing upon the validity of that patent, if necessary we would hold it invalid for that reason. Railway Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053; Matheson v. Campbell, 2 Cir., 78 F. 910.

As Judge Leahy stated in Kennametal, Inc. v. American Cutting Alloys, Inc., D.C. 1948, 77 F.Supp. 136, 141:

"The patent contains no disclosure of the characteristics of the product, by which it can be identified, apart from the description of the method of making the product."

### Sintering.

It is well to add here that while technically in his claims Schwarzkopf limited himself to a sintering maximum of 2000° C, defendant employs a temperature of 2100° to 2200° C. This might became a very important step in producing 78, 78B and 78C, also in G78B. But were this the only distinction in the making of these products, we doubt very much if we would fail to find an infringement. On the other hand when the sintering maximum is raised, followed by the addition of a carbide with cobalt, and since the melting point of the carbide is higher than that of the auxiliary metal, one can appreciate that the product resulting can be entirely different from that obtained by 22,166, and it must be, because defendant, after many experiments, has four of its five carbide tools made through this process.

### Patent 22,073.

22,073 is another product patent. It is for two-carbides, and for the reason advanced in reference to patent 22,166, we hold the patent could not properly be sustained as valid with a scope to cover any of defendant's products.

### Patent 22,074.

When we examine patent 22,074, known as the "final forming patent," it but emphasizes to us the attempt of plaintiff to claim a monopoly on any heat treatment that results in a solid solution because here the cobalt is mixed with the free carbides as the final step. There is in truth no "preforming." It appears to this court that this is just what Liebmann did over ten years before, and exactly what Schroter had in mind in his third patent. If 22,074 is a valid patent, then certainly 22,207 is not. We hold that 22,074 is an invalid patent.

It is plaintiff's position that defendant in making 78, 78B and 78C has partially followed each of patents 22,207 and 22,074 and thus infringed both. In view of the prior art, however, we find the sounder conclusion to be that it has infringed neither.

In summing up, and as we try to grasp the significance of what these patents really provide, we are impressed with the fact that this was a crowded field and that it would have been almost impossible for those trained in the art not to have seen some relationship between single carbides and multicarbides to be finally formed into a cemented tool. As previously stated, many were groping at the edge of discovery. The Liebmann tool was not commercially successful but he used both single and multicarbides. The Schroter tool took a single carbide and cemented it with cobalt. It became successful. The Schwarzkopf invention, as it finally became worded, merely added another carbide. And while it may be contended that this was a natural development, the fact remains that the General Electric, with its vast laboratory, and highly trained scientists and metallurgists, didn't do it. Schwarzkopf's invention, however, was not the solid solution. Voigtlander and others had that and when Schwarzkopf got through with preforming of the solid solution, he had no material for a cutting tool. It was not until he had cemented the solid solution with cobalt that he got a cutting tool substance. This was Schroter's contribution. Now, for Schwarzkopf or anyone else to claim that he can exclude all others using

the solid solution would have the effect of shutting himself out because of the other patents heretofore mentioned. Incidentally, the Becker patent 2,026,958, effective July 2, 1931, discloses the use of tungsten carbide with vanadium, columbium, or tantalum, admixed with an auxiliary metal and sintered, forming a solid solution, the exact method of 22,074 which we have held invalid.

There are many other defenses advanced, among them that all these patents are vague and too general, particularly 22,207. On this point, after throwing out the orginal German patent of 1929 and the orginal 1930 patent as being vague, the Patent Office evidently believed that they had been made definite enough and granted 22,207. It is also claimed by defendant that plaintiff tried to cover all of the field of hard refractory metals, some of which were not commercially successful and wouldn't make a good cutting tool; that later plaintiff disclaimed some of these, boron for example, but not soon enough. We believe that the disclaimers here, under the many cases, were filed in time. They do not broaden the patent, they narrow it.

There is no doubt about the efficacy and the commercial value of multicarbide tools. General Electric went to it. It even saw the possibility that Schwarzkopf had seen in 1932. It made an agreement with him under cross licensing of patents that it had. It also entered into an agreement with him in 1938 and paid royalties. Ordinarily, under the decisions (Hutto Engineering Co., Inc., v. Grinder Sales Co., D.C., 18 F.2d 985), this would have raised a strong presumption in favor of plaintiff, and we hold that it does, insofar as a narrow interpretation of the method laid down in 22,207 is concerned.

A judgment in accordance with this memorandum of opinion may be presented for our signature.

## APPENDIX A

Carbides—A compound of carbon and a metal element. The carbide molecule may be made up of one atom of a metal and one atom of carbon, such as WC, or different numbers of atoms, such as $Mo_2C$. The carbides of the metals dealt with in this case are hard and refractory.

Cemented—The carbide particles are densely distributed through the auxiliary binder which "cements" them into a coherent strong mass.

Continuous series—When two carbides merge in *all* proportions into solid solution, those carbides are spoken of as forming a continuous series of solid solutions. When two carbides form solid solutions only in a *limited range* of percentages, they are spoken of as forming an interrupted or limited series of solid solutions.

Crystals—A solid metal carbide exists in crystalline physical form. Each carbide by nature has its own particular shaped and dimensioned atomic arrangement, or form of crystal.

Fusing and casting—When metals, or their carbides, are sufficiently heated, they melt and can be poured into a mold and thus cast to desired shape.

Interference—This is a proceeding instituted in the United States Patent Office when independent inventors have copending applications which claim common subject matter. Since a patent can be issued only to the first inventor, the Patent Office in such cases conducts proceedings to determine the question of priority between the rival applicants.

Mixed crystals or solid solutions—Dependent on their inherent characteristics, certain of the carbides, when in physical contact and subjected to appropriate high temperatures merge by migration or reorientation of atoms so that the crystals are made up of atoms of carbon and atoms of two or more different metal elements.

Oxide—The metal elements also chemically combine with oxygen, and frequently occur in nature in the form of such oxides. The metal atoms and oxygen atoms of the molecules can be disunited, and the metal thus purified, by various procedures of "reduction."

Refractory—Fusing with difficulty, that is, having a high melting point.

Sintering—Subjecting a pressed compact mass of powdered metal or carbide for example, a carbide or a mixture of

carbides and auxiliary binder metal, such as cobalt, to a temperature below the melting point of the carbide and usually above the temperature of the melting point of the binder metal.

Solid solution—See "mixed crystals."

Solvent—The substance into which the solute dissolves to produce the solution. In the WC–TiC combination the TiC is the solvent.

## APPENDIX B

### PERIODIC ARRANGEMENT OF THE ELEMENTS

| Group III | Group IV | Group V | Group VI | Group VIII | | |
|---|---|---|---|---|---|---|
| Boron B | Carbon C | Nitrogen N | Oxygen O | | | |
| Aluminum Al | Silicon Si | Phosphorus P | Sulfur S | | | |
| Scandium Sc | Titanium Ti | Vanadium V | Chromium Cr | Iron Fe | Cobalt Co | Nickel Ni |
| Gallium Ga | Germanium Ge | Arsenic As | Selenium Se | | | |
| Yttrium Y | Zirconium Zr | Columbium Cb | Molybdenum Mo | Ruthenium Re | Rhodium Rh Palladium Pd | |
| Indium In | Tin Sn | Antimony Sb | Tellurium Te | | | |
| Lanthanum La | Cerium Ce | | | | | |
| | Hafnium Hf | Tantalum Ta | Tungsten W | Osmium Os | Iridium Ir Platinum Pt | |
| Thallium Tl | Lead Pb | Bismuth Bi | Polonium Po | | | |
| Actinium Ac | Thorium Th | | Uranium U | | | |